**Stella S. PRICE, Plaintiff–Appellant,**

v.

**Marshall E. PRICE, Sr., Defendant–Appellee.**

**No. 90–1480.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 3, 1990.

Decided April 1, 1991.

Thomas L. Phillips, Jr., argued (Thomas L. Phillips, Phillips, Phillips & Phillips, on brief), Rustburg, Va., for plaintiff-appellant.

Eleanor A. Putnam Dunn, argued (Bevin R. Alexander, Jr., R. Edwin Burnette, Jr., Edmunds & Williams, P.C., on brief), Lynchburg, Va., for defendant-appellee.

Before PHILLIPS and NIEMEYER, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

NIEMEYER, Circuit Judge:

We must decide in this case whether a negligence claim based on personal injury, sustained when a passenger disembarked from a small pleasure boat on the John H. Kerr Reservoir in Virginia, is within the admiralty jurisdiction of the federal courts under 28 U.S.C. § 1333.

On the afternoon of August 15, 1987, Stella S. Price was one of several passengers on a motorboat being operated by her husband, Marshall E. Price, Jr., on the John H. Kerr Reservoir (also known as Buggs Island Lake). As it began to rain, Mr. Price attempted to beach his boat at a nearby shore to disembark the passengers. As Mrs. Price attempted to disembark, a wave which had been created by the boat's wake caused her to lose balance and injure herself. In her complaint she alleges that Mr. Price exceeded a reasonable speed, that he failed to take the wake into account, that he failed to secure the boat adequately for disembarking passengers, and that he should have brought the boat in to allow the passengers to disembark over the side rather than the bow. Mr. Price filed a motion to dismiss the complaint for lack of jurisdiction, which the district court granted.

█ Admiralty jurisdiction over maritime torts depends on the *locus* of the tort on navigable waters and its *nexus* with traditional maritime activity. Although the determining test had for years been based strictly on the locus, beginning with the Supreme Court's decision in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), both criteria of *locus* and *nexus* must be satisfied. *See also Sisson v.*

*Ruby,* — U.S. ——, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), and *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).

In dismissing this case for lack of admiralty jurisdiction, the district court held that the Kerr Reservoir was not navigable because it is not "currently used for maritime purposes." J.A. 12. It also found that the tort did not bear a significant relationship to traditional maritime activity because "the plaintiff's case is one for simple negligence, therefore, traditional concepts of admiralty need not be invoked to resolve the case." J.A. 14. Because the district court failed to apply the appropriate standard on both points, we reverse.

I

In arguing that the Kerr Reservoir is not a navigable body of water, Mr. Price contends that admiralty jurisdiction should be limited "to those bodies of water where genuine commercial activity occurs." He argues that because "no maritime commerce takes place on its waters now nor is reasonably likely to take place in the future," the district court did not have admiralty jurisdiction, citing *Motley v. Hale,* 567 F.Supp. 39 (W.D.Va.1983), which held that a similar nearby lake (Smith Mountain Lake) was not a navigable waterway. Brief of Appellee at 8–9. The test advocated by Mr. Price is too narrow.

█ The law of admiralty developed to accommodate problems of commercial shipping on the high seas and navigable waters to provide uniform rules of conduct. Because of the potential adverse effect on the law of admiralty that might be caused by a different set of rules for pleasure craft, and indeed the direct disruptive impact on maritime activity itself by having noncommercial craft operate under rules different from those governing commercial craft, all activities on navigable waters that might have a significant relationship to traditional maritime activity are subject to the jurisdiction of the admiralty courts. *See Sisson,* 110 S.Ct. at 2895–96; *Foremost,* 457 U.S. at 674–75, 102 S.Ct. at 2658. Rules governing conduct on navigable waters cannot

remain uniform or have any certainty if their applicability is dependent on whether, on any given day, commercial maritime activity is being conducted on the waters. The resolution of every routine dispute would be burdened by the impracticable requirement of surveying the body of water before the threshold issue of jurisdiction could be determined. Thus, the test for navigability is based on a broader and more stable factor than whether the body of water is currently being used for commercial navigation. It must also include a consideration of whether the body of water is *capable* of bearing commercial navigation.

■ We return to the Supreme Court's definition of navigable waters given in *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870), where the Court said that waters are navigable

> when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

The definition has two disjunctive aspects. The waters are navigable if they are currently being used as a highway of commerce *or* if they are susceptible of being so used. Waters are susceptible of such use when they are, in their current configuration, capable of commercial navigation.

We recognize that the Court in *The Daniel Ball* was describing navigable waters of the United States as used in a regulation supported by the commerce clause, and we must be wary that the definition of navigability may vary depending on the purpose for which it is being used. *See Kaiser Aetna v. United States*, 444 U.S. 164, 170–71, 100 S.Ct. 383, 387–88, 62 L.Ed.2d 332 (1979). With that in mind, we nevertheless conclude that the definition of navigable waters given in *The Daniel Ball* is applicable in answering the question of whether waters are navigable for purposes of admiralty jurisdiction. Virtually every circuit that has invoked a definition of navigable waters in the context of determining admiralty jurisdiction has likewise resorted to

the definition in *The Daniel Ball*. *See Finneseth v. Carter*, 712 F.2d 1041, 1043–44 (6th Cir.1983); *Livingston v. United States*, 627 F.2d 165, 170 (8th Cir.1980), *cert. denied*, 450 U.S. 914, 101 S.Ct. 1354, 67 L.Ed.2d 338 (1981); *Adams v. Montana Power Co.*, 528 F.2d 437, 439 (9th Cir.1975); *cf. Chapman v. United States*, 575 F.2d 147, 151 (7th Cir.1978) (*en banc*) (no admiralty jurisdiction over a recreational boat accident which occurs on waters that are not used for commercial navigation and are not susceptible of such use in their present state), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978).

■ The Kerr Reservoir is one of a series of man-made lakes constructed in the Roanoke River Basin by the Army Corps of Engineers and by certain private utilities. It is regulated by the Army Corps of Engineers and patrolled by the Coast Guard. The Kerr Reservoir is the largest of the lakes in the series, having a shoreline of approximately 800 miles and a water surface area of over 48,000 acres. It straddles the state line between Virginia and North Carolina and is used almost entirely for pleasure boating. The parties have pointed to one professional fishing guide who makes his living chartering boats and services on the lake. All other commercial activity supports the recreational use. The only municipality on the reservoir, Clarksville, Virginia, informed the parties that its two large manufacturing concerns, Burlington Industries (a textile manufacturer) and Russell Stover (a candy maker), ship their products exclusively over land. No one in this case, however, disputes the fact that the Kerr Reservoir is capable of supporting commercial shipping.

Other lakes created by the Army Corps of Engineers in the Roanoke River Basin system include, among others, Philpott Lake and Lake Gaston. In *Souther v. Thompson*, 754 F.2d 151, 152 (4th Cir. 1985), we stated that Philpott Lake is a navigable waterway for purposes of admiralty jurisdiction. In *Richards v. Blake Builders Supply Inc.*, 528 F.2d 745, 746–47 (4th Cir.1975), we stated that both of the occurrences at issue there were on naviga-

ble waters, i.e. Lake Gaston and Cape Fear River, even though there was no evidence of any substantial commercial activity.

In finding that the Kerr Reservoir was not navigable, the district court directed its focus solely on whether the Kerr Reservoir was "currently being used" for commercial navigation. Concluding that evidence of one fisherman who charters his boat for recreational fishing is insufficient to "transform the lake into a navigable body of water," the court said,

> As such, I find that the lake is not currently used for maritime purposes. Accordingly, I find that Buggs Island Lake is not a navigable body of water for admiralty jurisdiction purposes.

J.A. 12.

■ Evidence that a body of water is currently being used for commercial navigation may support the conclusion that it *is* navigable. However, merely because a body of water is not currently being used for commercial navigation does not require the opposite conclusion, that it is not navigable. Even in the ordinary meaning of the word, navigable is significantly broader and encompasses the notion that a body of water is capable of being navigated.

> [T]he true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation.... The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use.

*The Montello,* 87 U.S. (20 Wall.) 430, 441, 22 L.Ed. 391 (1874).

Although the Kerr Reservoir may not currently be used for commercial navigation, because it is capable of being used for purposes of transportation and commerce by customary modes of trade and travel on water, it is a navigable waterway for purposes of determining admiralty jurisdiction.

## II

■ The additional prerequisite for exercising admiralty jurisdiction over a tort which occurs on navigable waters is that the tort bear a "significant relationship to traditional maritime activity." *Foremost,* 457 U.S. at 669, 102 S.Ct. at 2655; *Executive Jet,* 409 U.S. at 268, 93 S.Ct. at 504. In answering the inquiry of whether a tort bears the necessary nexus, we have directed that all circumstances of the tort be examined. To organize that inquiry we have identified four factors. *See Bubla v. Bradshaw,* 795 F.2d 349, 351 (4th Cir.1986) (the functions and roles of the parties, the types of vehicles and instrumentalities involved, the causation and type of injury, and traditional concepts of the role of admiralty); *see also Oman v. Johns–Manville Corp.,* 764 F.2d 224, 230 and n. 3 (4th Cir.), *cert. denied,* 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985).

In *Sisson,* however, the Supreme Court redirected the inquiry from an examination of the particular circumstances of the tort in question to a more generalized analysis to determine whether principles applicable to resolving the tort issues will impact traditional maritime activity. Keeping the focus on the potentially disruptive impact on maritime commerce, the Court directed that the "jurisdictional inquiry does not turn on the *actual* effects" nor on "the particular facts of the incident" involved. 110 S.Ct. at 2896 (emphasis in original). "Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.*

An examination of the factors which we identified in *Bubla* and *Oman* is still an acceptable systematic method for making the analysis. However, we must project more generally the composite genre of the tort or its essential elements and determine whether traditional maritime commerce will be affected. Thus, the crash into navigable waters of an airplane which was crippled on takeoff over land or the injury sustained by a swimmer in navigable waters from a collision with another swimmer may give rise to tort claims, but not claims that bear a substantial relationship to traditional maritime activity. *Executive Jet,* 409 U.S. at 255, 268, 93 S.Ct. at 498, 504. On the other hand, an accident between two pleas-

ure craft resulting from errors in navigation is held to involve principles of traditional maritime rules, even though no commercial entity was a participant in the particular incident. *Foremost*, 457 U.S. at 675 & n. 5, 102 S.Ct. at 2658 & n. 5. It is maintained there that rules fashioned for pleasure craft would likely have an impact on the intercourse of pleasure craft with commercial shipping. *Id.* at 676, 102 S.Ct. at 2659.

In broadening the nexus test to include torts involving solely pleasure craft, the rule of *Foremost* has provoked a legitimate inquiry into the proper balance between admiralty jurisdiction and traditional civil jurisdiction over torts. *See* Smith, *Choice of Law Analysis: The Solution to the Admiralty Jurisdictional Dilemma*, 14 Tul.Mar.L.J. 1, 26–35 (1989); Carnilla and Drzal, *Foremost Insurance Co. v. Richardson: If this is Water, It Must be Admiralty*, 59 Wash.L.Rev. 1 (1983). A similar concern understandably prompted the district court to reach the decision it did in this case. Nevertheless, we are bound to apply the principles of *Foremost* and *Sisson* to this case.

In this case the district court concluded that the substantial relationship with maritime activity did not exist because

> [t]he plaintiff's case is one for simple negligence, therefore, traditional concepts of admiralty need not be invoked to resolve this case.
>
> Accordingly, I find that the plaintiff has failed to show a sufficient nexus between her injury and traditional maritime activity.

J.A. 14. The district court's analysis, however, must be taken one step further, by asking whether the core activity giving rise to Mr. Price's alleged negligent conduct was related to an activity which is traditionally maritime. The complaint of Mrs. Price specifically charged Mr. Price with errors in navigation. She complained that with his excessive speed he generated a wake that caused her injury. She also complained that he failed to approach the shore correctly for the purpose of beaching his boat and disembarking his passengers.

By applying the *Sisson* approach and examining the general character of the allegations, we conclude that the overriding factor in this case, which brings it within the courts of admiralty, is the source of liability emanating from the navigation of a vessel, albeit a small pleasure boat. *See Foremost*, 457 U.S. at 675 n. 5, 102 S.Ct. at 2658 n. 5 (noting "traditional concern that admiralty law holds for navigation"); *Hogan v. Overman*, 767 F.2d 1093, 1094 (4th Cir.1985) (the most fundamental of traditional maritime activities is navigation of a vessel); *Oliver by Oliver v. Hardesty*, 745 F.2d 317, 319–20 (4th Cir.1984) (noting that *Foremost* placed significant emphasis on the importance of governing the navigation of all vessels).

Because the tort described in the complaint occurred on navigable waters and bore a substantial relationship to traditional maritime activity, admiralty jurisdiction was properly invoked by the plaintiff. The order of the district court dismissing the case for lack of subject matter jurisdiction is reversed, and this case is remanded for further proceedings.

REVERSED AND REMANDED.