On Application for Rehearing
The opinion of May 27, 1994, is withdrawn and the following is substituted therefor.
Thomasine Choat appeals from an adverse summary judgment in her action seeking damages for the alleged wrongful death of her daughter, Connie Johnson. We reverse and remand.
The evidence suggests the following: On July 15, 1991, 18-year-old Connie Johnson and her friend Lania Moore were relaxing on inflatable floats approximately 50 feet from the shoreline of a slough in Wilson Lake, an impoundment of the Tennessee River. In the same slough, 13-year-old Michael Fields was operating a "Kawasaki Jet Ski." Michael made a number of "playful" passes close to the floats in order to "splash" the girls. Brief of Appellee, at 4. On one of the passes, the Jet Ski struck Connie in the head. She fell from her float and disappeared beneath the surface. A diver subsequently located Connie's body in approximately 22 feet of water and retrieved it from the bottom of the slough. At the time of Connie's death, she was unmarried and had no dependents.
On April 23, 1992, Thomasine Choat filed a wrongful death action against Kawasaki Motors Corporation, Kawasaki Heavy Industries, Ltd., and Kawasaki Motors Manufacturing Corporation, U.S.A. ("collectively referred to as Kawasaki"), and a number of individual defendants.[1] Her claims against Kawasaki sought damages based on allegations of negligence, wantonness, and liability under the Alabama Extended Manufacturer's Liability Doctrine. Kawasaki moved for a summary judgment, contending that the claims were subject to admiralty jurisdiction and arguing that under maritime law nondependents may not recover in a wrongful death action punitive damages or damages for loss of society. The trial court entered a summary judgment in favor of Kawasaki, and Choat appealed. On appeal, Choat contends (1) that maritime law does not apply to her action, and, alternatively, (2) that its application does not supersede the remedies provided by the Alabama Wrongful Death Act, Ala. Code 1975, § 6-5-391.
 I. Jurisdiction
Admiralty jurisdiction would be proper in this case if the incident of which Choat complains meets two criteria set forth by the United States Supreme Court. First, the type of incident
involved must "potential[ly affect] maritime commerce." Sissonv. Ruby, 497 U.S. 358, 363, 110 S.Ct. 2892, 2896,111 L.Ed.2d 292 (1990). Second, the type of activity involved must bear " 'a substantial relationship to traditional maritime activity.' " Id. at 362, 110 S.Ct. at 2895 (quoting Foremost Insurance Co.v. Richardson, 457 U.S. 668, 675 n. 5, 102 S.Ct. 2654, 2658 n. 5, 73 L.Ed.2d 300 (1982)).
 A. Potential Effect
To determine the "potential effect on maritime commerce," we must imagine an incident of the same general character as the incident under consideration as having occurred, not in the location in which it actually occurred, but in the busiestconceivable sea lane. From that premise, we must then postulate the possible effect on commercial *Page 881 
shipping of the occurrence in that latter location. Sisson,497 U.S. at 363, 110 S.Ct. at 2896 ("a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity"); Price v. Price, 929 F.2d 131, 135 (4th Cir. 1991) (under Foremost and Sisson, "we must project more generally the composite genre of the tort or its essential elements and determine whether traditional maritime commerce will be affected"). Thus, in Foremost, the Court held that a collision on the Amite River in Louisiana between an "eighteen foot pleasure boat" towing a water skier and a "sixteen-foot 'bass boat' " potentially interfered with maritime commerce, notwithstanding the facts that neither vessel had ever been engaged in commercial maritime activity and that the situs of the accident had been "seldom, if ever, used for commercial activity." Foremost Insurance Co. v. Richardson, 457 U.S. 668,678, 102 S.Ct. 2654, 2660, 73 L.Ed.2d 300 (1982) (Powell, J., dissenting). The Foremost Court, as Sisson later more fully explained, "supported [its] finding of potential disruption . . . with a description of the likely effects of a collision at the mouth of the St. Lawrence Seaway, . . . an area heavily traveled by commercial vessels." Sisson, 497 U.S. at 363,110 S.Ct. at 2896 (emphasis added). In Sisson itself, the Supreme Court held that an action based on fire damage to a Lake Michigan marina and to vessels docked therein invoked admiralty jurisdiction, notwithstanding the facts that the vessel in which the fire originated was a "56-foot pleasure yacht," id., at 360, 110 S.Ct. at 2894, and that no commercial vessels were docked at the marina at the time of the fire. Id. at 363,110 S.Ct. at 2896. Because, the Court noted, fire poses a perennial danger to commercial vessels, the genre of the occurrence involved in Sisson — "fire on a vessel docked at a marina on navigable waters" — constituted a "potential hazard to maritime commerce." Id. at 362-63, 110 S.Ct. at 2895.
Under these principles, we must conclude that the incident of which Choat complains — a fatal collision on navigable water — potentially affects maritime commerce. Were an incident of this genre to occur "at the mouth of the St. Lawrence Seaway,"Foremost, 457 U.S. at 675, 102 S.Ct. at 2658, emergency personnel could be called to rescue victims or to retrieve casualties. Such rescue activities could interrupt commercial shipping. See Complaint of Bird, 794 F. Supp. 575, 579
(D.S.C. 1992) ("commotion" conceivably arising from attempts to rescue a "[man overboard] in a crowded seaway would potentially have an impact on maritime commerce"); Sinclair v. Soniform,Inc., 935 F.2d 599, 602 (3d Cir. 1991) ("possibility that commercial vessels would be diverted to respond" to distress signals to aid a diver suffering from "decompression sickness" potentially affected maritime commerce). Thus, because the occurrence of an incident of this general character potentially affects maritime commerce, the first criterion of the jurisdictional analysis is met.
 B. Substantial Relationship
"Operating a vessel is a traditional maritime activity."Lipworth v. Kawasaki Motors Corp., U.S.A., 592 So.2d 1151, 1153
(Fla.Dist.Ct.App.), cert. denied, 506 U.S. 974,113 S.Ct. 465, 121 L.Ed.2d 373 (1992). Therefore, in connection with thesecond step of the jurisdictional inquiry, the parties have devoted considerable attention to the question whether a Jet Ski is a "vessel." This question has not been unanimously resolved, and at least one court has answered the question in the negative.
In Complaint of Roffe, 724 F. Supp. 9, 1011 n. 2 (D.P.R. 1989), the operator of a "WaveJammer" that she had rented from Roffe, was killed when she collided with a yacht.Id. at 9. Roffe began an action pursuant to the Limitation of Liability Act of 1851, 46 U.S.C.App. § 183, seeking to limit his liability to $2500, the cost of the WaveJammer.724 F. Supp. at 9. Reasoning that the application of the Act to "pleasure crafts," and, in particular, to the relatively inexpensive WaveJammer, would often inadequately compensate for serious injuries or death, the court held that the Act did not apply to "pleasure crafts." Id. at 10. As an alternative basis for excluding the owner of the WaveJammer from the application of the Act, the court stated: "[W]e decline to rule *Page 882 
that the WaveJammer, one of a new breed of aquatic motorbikes, is a vessel within the meaning of the statute. As described in the literature submitted by the petitioner. . . ., it is avehicle characterized as a personal watercraft designed for only one rider." Id. at 10-11 n. 2 (emphasis in original).
Complaint of Roffe, however, did not involve the jurisdictional question involved in this case, that is, whether admiralty jurisdiction was proper. In our view, the rationale for defining such machines as nonvessels for purposes of the Limitation of Liability Act is entirely separate from, and probably inapplicable to, the question whether such devices are vessels for jurisdictional purposes. Nevertheless, at least one court has concluded that a Jet Ski is a "vessel," even for purposes of the Limitation of Liability Act. Keys Jet Ski, Inc.v. Kays, 893 F.2d 1225 (11th Cir. 1990) (collision involving a Jet Ski and a motorboat).
More on point are Wahlstrom v. Kawasaki Heavy IndustriesLtd., 800 F. Supp. 1061 (D.Conn. 1992) (Jet Ski collided with a motorboat), vacated on other grounds, 4 F.3d 1084 (2d Cir. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1060,127 L.Ed.2d 380 (1994), and Lipworth v. Kawasaki Motors Corp.,U.S.A., 592 So.2d 1151 (Fla.Dist.Ct.App.) (Jet Ski collided with a dock), cert. denied, 506 U.S. 974, 113 S.Ct. 465,121 L.Ed.2d 373 (1992). Both of those cases, like this case, involved products liability claims against Kawasaki. Both courts regarded Jet Skis as vessels and held that maritime law applied. Wahlstrom concluded that "the operation of a motorized Jet Ski, like [the operation of] a small motor boat, sufficiently implicates traditional maritime activities." 800 F.2d at 1062. Lipworth discerned "no reasonable distinction between small motor boats capable of being used as a means of transportation on water and a Jet Ski, which is also capable of substantially equivalent transportation on water." 592 So.2d at 1153.
Wahlstrom and Lipworth both relied, in part, on 1 U.S.C. § 3
(1982) (the "general provisions" section), which defines "vessel" in the broadest of terms. Specifically, § 3 defines the term "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." Indeed, this definition might well include " 'the three men in a tub,' " or " 'Jonah inside the whale.' " McCarthy v. The Bark Peking, 716 F.2d 130,135 (2d Cir. 1983) (quoting Burks v. American RiverTransportation Co., 679 F.2d 69, 75 (5th Cir. 1982)), cert.denied sub nom. South Street Seaport Museum v. McCarthy,465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984).
Also significant is the manner in which the owner's manual and similar material provided with the Jet Ski in this case characterize the machine. For example, this material states in part: "The Jet Ski is not a toy; it is a high performance classA power boat. With a lightweight rider, a Jet Ski accelerates more quickly and has a higher top speed than with a heavier rider." (Emphasis added.)
Additionally instructive are characterizations of the Jet Ski contained in correspondence to Kawasaki from the United States Coast Guard. In a letter issued on March 9, 1983, the Coast Guard, pursuant to Kawasaki's request, granted Kawasaki an "exemption" from various federal standards, including the "Certification of Compliance" standard, set forth in 33 C.F.R. § 181(B); the "Safe Loading Standard, the Flotation Standard, the Electrical Systems Standard, the Fuel Systems Standard and the powered ventilation portion of the Ventilation Systems Standard," set forth in 33 C.F.R. § 183(B)-(C), (F), (I)-(K).
In considering an exemption from the safe loading standard, the Coast Guard, in the letter to Kawasaki, stated that "the Jet Ski boat could not, as a practical matter, be tested in accordance with the language of the standard which is intended to deal with a conventional boat of open hull construction." (Emphasis added.) The Coast Guard also noted that the provisions of the ventilation standard are not dispositive as to the Jet Ski, because it "is designed to be capable of beingcapsized and partially submerged without causing the engine to cease operating," and because "the boat is equipped with a carburetor that has no float bowl and is sealed against leakage." (Emphasis added.) As to a requested variance in the format and placement *Page 883 
of certification labels, the Coast Guard reasoned that "as long as the label continues to be visible to the operator whenboarding the boat or getting the boat underway, the . . . placement of the label on the rear portion of the engine cover [should be considered] as meeting the requirement for the visibility of the label." (Emphasis added.) In considering an exemption from the floatation standard, the Coast Guard "found that the amount of flotation material provided in the Jet Skiboat [was] sufficient to float the weight of the boat, its permanent appurtenances and the operator, and thus [met] the intent of the Floatation Standard." (Emphasis added.) The Coast Guard concluded that, as to "the Kawasaki Motors Corp., U.S.A.boats known as the 'Jet Ski,' " the requested exemptions "would not adversely affect boating safety." (Emphasis added.)
That the Jet Ski is not a "conventional boat" is not the dispositive consideration. It is a self-propelled device without nonaquatic function or capacity. The definitions and descriptions cited above lead us to hold that, at least for jurisdictional purposes, a Jet Ski is a "vessel," and, consequently, to characterize its operation and steerage as navigation.
In this connection, we must disagree with Choat's characterization of this case as one not involving allegations of "improper navigation." Brief of Appellant, at 15. The complaint alleges that the Jet Ski was defective because "of its unreasonably dangerous operating and handlingcharacteristics," and "because of its lack of warning that it[would] not turn without engaging [the] throttle and that when[the] throttle [was] disengaged it [would] tend to go straighteven when the operator attempt[ed] a turn." (Emphasis added.) These allegations demonstrate the logical difficulty in separating the activity of navigation from Choat's cause of action. Navigation was, after all, the activity that rendered the alleged design defect dangerous.
Because we regard the operation of a Jet Ski as the navigation of a vessel, we need not determine whetherConnie's floatation device also was a vessel. Admiralty jurisdiction is invoked by an activity involving the navigation of a vessel into, or over, (1) a swimmer, Oliver v. Hardesty,745 F.2d 317 (4th Cir. 1984); Hogan v. Overman, 767 F.2d 1093
(4th Cir. 1985) (waterskier struck by a vessel); Medina v.Perez, 733 F.2d 170 (1st Cir. 1984) (swimmer struck by a pleasure boat), cert. denied, 469 U.S. 1106, 105 S.Ct. 778,83 L.Ed.2d 774 (1985); or (2) a stationary object, McCormick v.United States, 680 F.2d 345 (5th Cir. 1982) (action involving a pleasure boat's collision with a piling); Hebert v. OutboardMarine Corp., 638 F. Supp. 1166 (E.D.La. 1986) (action involving a homemade skiff's collision with a piling).
This case is, therefore, distinguishable from Woltering v.Outboard Marine Corp., 245 Ill. App.3d 684, 185 Ill.Dec. 791,615 N.E.2d 86 (1993), appeal denied, 152 Ill.2d 582, 190 Ill.Dec. 912, 622 N.E.2d 1229 (1993), petition for cert. filed, 62 U.S.L.W. 3493 (U.S. January 4, 1994) (No. 93-1098). In that recent case, cited by Choat, the court held that an action arising from the death of a passenger who "was thrown" from a pleasure craft and fatally injured by the propeller of the boat's outboard motor did not invoke admiralty jurisdiction.Woltering, unlike this case, contained no evidence of anavigational malfunction. Significantly, the court noted: "While negligent navigation is not necessary to invoke admiralty jurisdiction, its presence strongly suggests thepropriety of applying admiralty law." 245 Ill. App. 3d at 688, 185 Ill.Dec. at 794, 615 N.E.2d at 89 (emphasis added). Thus,Woltering provides no authority for the application of state law in this case.
Indeed, the United States Supreme Court — see Yamaha MotorCorp., U.S.A. v. Calhoun, ___ U.S. ___, 116 S.Ct. 619,133 L.Ed.2d 578 (1996), which shall be discussed more fully in Part II of this opinion — recently considered a case involving the collision of a WaveJammer piloted by a minor child with a vessel that was anchored in the water before a beachfront hotel in Puerto Rico. Preferatory to its discussion of the issue of remedies, the Court summarily concluded: "Because this case involves a watercraft collision on navigable waters, it falls within admiralty's domain. See Sisson v. Ruby, 497 U.S. 358,361-367, 110 S.Ct. 2892, 2895-2898, 111 L.Ed.2d 292 (1990);Foremost Ins. Co. v. *Page 884 Richardson, 457 U.S. 668, 677, 102 S.Ct. 2654, 2659,73 L.Ed.2d 300 (1982)." ___ U.S. at ___, 116 S.Ct. at 623. We conclude, therefore, that the second criterion of the jurisdictional inquiry is satisfied, and that maritime law governs Choat's claims against Kawasaki.
 II. Remedy
This conclusion does not, however, dispose of Choat's alternative argument, namely, that regardless of whether maritime law applies, she is entitled to the remedies provided by the Alabama Wrongful Death Act. This contention is correct from a historical perspective, because until 1920 American admiralty courts did not recognize wrongful death claims based on general maritime law. Moragne v. States Marine Lines, Inc.,398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). In 1920, Congress enacted the Death on the High Seas Act ("DOHSA"),[2] 41 Stat. 537 (codified as amended at 46 U.S.C.App. §§ 761-68 (1987)), and the Jones Act, 41 Stat. 1007 (codified at 46 U.S.C.App. § 688 (1987)), which extended to seamen the protections afforded railroad employees under FELA.[3] Sheffieldv. Owens-Corning Fiberglass Corp., 595 So.2d 443, 447 n. 1 (Ala. 1992). Thus, where federal statutes were inapplicable, courts exercising admiralty jurisdiction applied remedies available under state statutes operative in the territorial waters in which the tort occurred. The Tungus v. Skovgaard,358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959). In Moragne v.States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772,26 L.Ed.2d 339 (1970), the United States Supreme Court adopted a rule that called into question the validity of this practice.
Moragne arose out of the death of a longshoreman aboard a vessel in Florida's navigable waters. His widow, Petsonella Moragne, seeking damages for wrongful death, sued the vessel owner in a state court under theories of negligence and unseaworthiness. 398 U.S. at 376, 90 S.Ct. at 1775. The defendants, on the basis of diversity of citizenship, removed the action to a federal district court, which subsequently "dismissed" the unseaworthiness count on the ground that it did not invoke federal statutes and was not recognized under Florida's wrongful death statute. After the United States Court of Appeals for the Fifth Circuit affirmed the order of the trial court, Moragne sought certiorari review in the United States Supreme Court.
The Supreme Court reversed the judgment of the court of appeals and recognized, for the first time, the right to assert federal, nonstatutory claims for maritime torts resulting in death. The Court cited examples of federal and state legislation as convincing evidence of public policy favoring wrongful death actions. Questioning whether American admiralty's hostility to such actions had ever been justified, the Court remanded the *Page 885 
cause for reconsideration of the widow's unseaworthiness claim.
Although Moragne did not articulate the remedies available under the new causes of action or define with particularity the scope of its application, a number of courts construed the opinion as "preempt[ing] state causes of action and remedies,"Texaco Refining Marketing, Inc. v. Estate of Dau Van Tran,808 S.W.2d 61, 64 (Tex.) (emphasis added), cert. denied,502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 245 (1991) in all actions subject to admiralty jurisdiction. Wahlstrom v. Kawasaki HeavyIndus., Ltd., 4 F.3d 1084, 1087 (2d Cir. 1993), cert. denied,510 U.S. 1114, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994); see alsoNelson v. United States, 639 F.2d 469 (9th Cir. 1980). After the release of our original opinion in this case, however, the United States Supreme Court decided Yamaha Motor Corp., U.S.A.v. Calhoun, ___ U.S. ___, 116 S.Ct. 619, 133 L.Ed.2d 578
(1996), in which it expressly rejected this view of Moragne.
Calhoun involved an action against Yamaha Motor Company, U.S.A., and Yamaha Motor Company, Ltd. ("Yamaha") by the parents — administrators of the estate — of 12-year-old Natalie Calhoun, who was killed when the Yamaha WaveJammer she was riding collided with a vessel docked in the navigable, territorial waters of Puerto Rico. ___ U.S. at ___,116 S.Ct. at 620. The Calhouns, who were Pennsylvania residents, sued under provisions of Pennsylvania's Wrongful Death and Survival Acts, seeking compensation under several theories of recovery, including "negligence, strict liability, and breach of implied warranties." Id.
"Yamaha moved for partial summary judgment, arguing [— as does Kawasaki in this case —] that the federal maritime wrongful death action . . . recognized in Moragne v. StatesMarine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339
(1970), provided the exclusive basis for recovery, displacing all remedies afforded by state law." ___ U.S. at ___,116 S.Ct. at 622. Consequently, Yamaha insisted, "the Calhouns could recover as damages only Natalie's funeral expenses." ___ U.S. at ___, 116 S.Ct. at 622. The United States District Court for the Eastern District of Pennsylvania denied Yamaha's partial summary judgment motion to the extent that it would have precluded recovery of compensation for "loss of society and loss of support and services," holding that such remedies were recoverable under Moragne. Calhoun v. Yamaha Motor Corp.,U.S.A., 40 F.3d 622, 625 (3d Cir. 1994). It granted Yamaha's partial summary judgment motion to the extent that the Calhouns sought compensation for lost future wages and sought punitive damages. The Court of Appeals for the Third Circuit reversed the summary judgment, holding that Moragne did not "preempt state law wrongful death acts in actions based on the death of a nonseaman in territorial waters." Id. at 644. The United States Supreme Court granted certiorari review to consider that holding. ___ U.S. at ___, 116 S.Ct. at 623.
In a unanimous opinion, the Supreme Court affirmed the judgment of the Court of Appeals. In connection with a thorough historical analysis of Moragne and its antecedents, the Court explained:
 "Moragne . . . centered on the extension of relief, not on the contraction of remedies. The decision recalled that ' " 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.' " ' [398 U.S.] at 387 [90 S.Ct. at 1781] (quoting The Sea Gull, 21 F.Cas. 909, 910 (No. 12,578) (CC Md. 1865) (Chase, C.J.)). The Court tied Petsonella Moragne's plea based on the unseaworthiness of the vessel to a federal right-of-action anchor, but notably left in place the negligence claim she had stated under Florida's law. See 398 U.S., at 376-377
[90 S.Ct. at 1775-76].
 "Our understanding of Moragne accords with that of the Third Circuit, which Judge Becker set out as follows:
 "Moragne . . . showed no hostility to concurrent application of state wrongful death statutes. Indeed, to read into Moragne the idea that it was placing a ceiling on recovery for wrongful death, rather than a floor, is somewhat a historical. The Moragne cause of action was in *Page 886 
many respects a gap-filling measure to ensure that seamen (and their survivors) would all be treated alike. The ' "humane and liberal" ' purpose underlying the general maritime remedy of Moragne was driven by the idea that survivors of seamen killed in state territorial waters should not have been barred from recovery simply because the tort system of the particular state in which a seaman died did not incorporate special maritime doctrines. It is difficult to see how this purpose can be taken as an intent to preclude the operation of state laws that do supply a remedy.' 40 F.3d at 641-642 (citation omitted)."
___ U.S. at ___, 116 S.Ct. at 628. (emphasis added) (footnotes omitted). Thus, the Supreme Court held that the application of maritime law in a case involving the death of a nonseaman in state territorial waters does not displace remedies available under that state's wrongful death statutes. ___ U.S. at ___,116 S.Ct. at 628.
The Supreme Court's holding in Calhoun is controlling in this case. We hold, therefore, that Choat may recover such damages as are provided by § 6-5-391, Ala. Code 1975, notwithstanding the fact that this dispute is subject to admiralty jurisdiction.[4] The judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.
APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
MADDOX, SHORES, HOUSTON, INGRAM, and BUTTS, JJ., concur.
[1] Choat eventually released the individual defendants pursuant to a pro tanto settlement for $125,000.
[2] DOHSA provides in pertinent part:
 "[§ 761] Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.
 "[§ 762] The recovery in such suit shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought and shall be apportioned among them by the court in proportion to the loss they may severally have suffered by reason of the death of the person by whose representative the suit is brought."
(Emphasis added.)
[3] The Jones Act provides in part:
 "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable."
46 U.S.C.App. § 688.
[4] Of course, we express no view of the merits of Choat's action.