**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 23-1937**

─────────

BALTIMORE GAS & ELECTRIC COMPANY,

      Plaintiff – Appellant,

    v.

COASTLINE COMMERCIAL CONTRACTING, INC.; CANDICE M. BATEMAN; RAYMOND C. BOSTIC,

      Defendants – Appellees.

─────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Lydia Kay Griggsby, District Judge. (1:22−cv−00696−LKG)

─────────

Argued: May 10, 2024                       Decided: July 9, 2024

─────────

Before WILKINSON, NIEMEYER, and QUATTLEBAUM, Circuit Judges.

─────────

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion in which Judge Niemeyer and Judge Quattlebaum joined.

─────────

**ARGUED:** Louis Joseph Kozlakowski, Jr., WRIGHT, CONSTABLE & SKEEN, LLP, Towson, Maryland, for Appellant. Louis C. Long, THOMAS, THOMAS & HAFER LLP, Pittsburgh, Pennsylvania; Mark Randall Brown, H. BARRITT PETERSON, JR. & ASSOCIATES, Towson, Maryland, for Appellees. **ON BRIEF:** Charles B. Peoples, THOMAS, THOMAS & HAFER LLP, Washington, D.C., for Appellee Coastline Commercial Contracting, Inc.

─────────

WILKINSON, Circuit Judge:

In 2019, a 13,000-volt electric cable lying at the bottom of Eli Cove in Pasadena, Maryland was damaged. According to Baltimore Gas & Electric Co.—the public utility which owned and maintained the cable—the cable was struck by a barge that Coastline Commercial Contracting owned. Coastline allegedly hit the cable while performing work for a couple who owned property on the cove and who had hired Coastline to extend their pier. Baltimore Gas & Electric sued Coastline and the owners for negligence. The issue before us is whether a court of the United States has admiralty jurisdiction to determine the existence and extent of Coastline's tort liability. The district court determined that it did not have such jurisdiction. For the reasons that follow, we hold that this case falls within federal admiralty jurisdiction. We thus reverse the district court and remand for further proceedings.

## I.

The complaint alleged the following facts. Candice Bateman and Raymond Bostic (the "Owners") own property on Eli Cove, a tidal inlet off of Stoney Creek. Like other properties on the cove, the Owners' property includes a pier and riparian rights to build out into the waters. And this they sought to do.

In March 2019, the Owners hired Coastline to extend their existing pier further into the cove. The project required Coastline to send a barge from its headquarters on Stoney Creek to excavate the cove's floor and to install new pilings which would support the additions.

2

Resting at the bottom of the cove was a high-voltage electric cable owned and maintained by Baltimore Gas & Electric. Baltimore Gas & Electric laid the submerged cable in 1986, where it rested undisturbed for over thirty years. As Coastline was transporting the barge to carry out the work on the Owners' pier, it allegedly struck the cable, causing immediate loss of electricity to the area and damaging the cable to the tune of $1.3 million in repairs.

Baltimore Gas & Electric filed suit in federal district court against Coastline and the Owners. It alleged that Coastline failed to exercise reasonable care in performing the work for the Owners and that the Owners negligently failed to notify Coastline of the location and existence of the cable. Baltimore Gas & Electric invoked federal admiralty jurisdiction over the claim against Coastline and supplemental jurisdiction over the claim against the Owners.

Coastline and the Owners filed motions to dismiss for lack of admiralty jurisdiction. The district court granted the motions. *See Balt. Gas & Elec. Co. v. Coastline Comm. Contracting, Inc.*, 681 F. Supp. 3d 454, 461 (D. Md. 2023).

For background, admiralty jurisdiction over maritime torts depends on the location of the tort—whether it occurs on navigable waters—and its relation to traditional maritime activity. *See Price v. Price*, 929 F.2d 131, 133 (4th Cir. 1991). In dismissing the case, the district court found that Eli Cove was not part of the navigable waters because it could not accommodate commercial navigation and was not susceptible of being used as a highway for commerce. *Balt. Gas & Elec.*, 681 F. Supp. 3d at 459–61. The district court also found that the incident did not bear a significant relationship to traditional maritime activity

3

because "Coastline's barge was present on Eli Cove solely to extend an existing pier at a private residence." *Id.* at 461.

After de novo review, *see White v. United States*, 53 F.3d 43, 45 (4th Cir. 1995), we hold that the district court applied the incorrect standard when making each determination and that it indeed has admiralty jurisdiction over the suit. We therefore reverse.

## II.

The Constitution permits—and Congress has conferred—jurisdiction to the federal courts over "admiralty and maritime" cases. U.S. Const. art. III § 2; 28 U.S.C. § 1333. The primary justification for entrusting admiralty cases to the federal courts is to protect "the important national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation." 1 Admiralty & Mar. Law § 3:3 (6th ed.); *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 544 (1995) ("[T]he basic rationale for federal admiralty jurisdiction is 'protection of maritime commerce through uniform rules of decision[.]'"). Thus, a case subject to federal admiralty jurisdiction will be governed by the uniform body of common law precepts and statutes comprising federal maritime law. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996). "This body of law serves to protect commercial activity by ensuring that uniform rules of conduct are in place." *Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 709 F.3d 1055, 1061 (11th Cir. 2013); *Exec. Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 269–70 (1972).

A party seeking to invoke federal admiralty jurisdiction over a tort claim must satisfy conditions both of location and of connection with traditional maritime activity. The

4

test is twofold: "The alleged wrong must occur or be located over a navigable waterway, and the wrong must bear a significant relationship to traditional maritime activity." *Mullenix v. United States*, 984 F.2d 101, 104 (4th Cir. 1993); *see also Grubart*, 513 U.S. at 534–35. We address each condition in turn.

A.

As discussed, federal admiralty jurisdiction depends in part on where the tort occurred. "A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534. Here the tort certainly occurred on water. But is Eli Cove "navigable" for purposes of admiralty jurisdiction?

Tidal waters like Eli Cove have long been recognized as navigable for purposes of admiralty jurisdiction. *See Hassinger v. Tideland Elec. Membership Corp.*, 781 F.2d 1022, 1026 (4th Cir. 1986). Indeed, until the mid-nineteenth century, admiralty jurisdiction was limited to tidal waters. *The Steam-Boat Thomas Jefferson*, 23 U.S. (10 Wheat.) 428, 429 (1825); *The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 451 (1851). Though admiralty jurisdiction can now extend to all navigable waters, including lakes and rivers, tidal waters remain the prototypical navigable waters and firmly fall within the ambit of federal admiralty jurisdiction. *See Complaint of Paradise Holdings, Inc.*, 795 F.2d 756, 759 (9th Cir. 1986); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 610 (3d Cir. 1974), *cert. denied*, 420 U.S. 927 (1975) (mem.); 1 Admiralty & Mar. Law § 3:3 ("The traditional domain of admiralty jurisdiction is, of course, the sea, including waters within the ebb and flow of the tide.").

5

The district court recognized that Eli Cove is part of the tidal waters of the Chesapeake Bay yet held that Eli Cove was not navigable because it was not "susceptible of being used as a highway for commerce." *Balt. Gas & Elec.*, 681 F. Supp. 3d at 460. The susceptibility prong is important because it focuses the inquiry on potential as well as actual use. *See Price*, 929 F.2d at 134; *Mullenix*, 984 F.2d at 104. Thus "[w]e have judged navigability based on a waterway's capability to bear commercial navigation." *Mullenix*, 984 F.2d at 104. Waters are navigable when they "are currently being used as a highway of commerce *or* if they are susceptible of being so used." *Price*, 929 F.2d at 134. And "[w]aters are susceptible of such use when they are, in their current configuration, capable of commercial navigation." *Id.*

The district court found that Eli Cove was neither being used as a highway of commerce nor susceptible of such use because it was a residential inlet whose purpose was "to provide access to the water from these residences" and because it was too shallow to support commercial navigation. *Balt. Gas & Elec.*, 681 F. Supp. 3d at 460. But this determination is belied by the undisputed facts in this case: not only is the cove lined with commercially built piers, but Coastline itself was engaged in commercial activity when it allegedly struck the underwater cable.

Moreover, the district court's determination overlooked the nature of the Chesapeake Bay and its tributaries. The district court recognized that "Eli Cove flows into Stoney Creek, which . . . in turn, flows into the Patapsco River and Chesapeake Bay." *Id.* One could push off from the cove and travel along an uninterrupted route to the Bay to reach Virginia and on to the Atlantic Ocean. This is quintessential navigability. Indeed,

6

though not an assessment of navigability through the lens of admiralty law, Baltimore Gas & Electric's 1986 permit from the Department of the Army to lay the submerged cable noted it was a "structure in or affecting navigable waters of the United States." J.A. 54.

The fact that many of the properties abutting the cove are residential homes is not relevant. Courts have repeatedly held that current use does not determine navigability. To hold that navigability depends on current commercial use would preclude the uniformity and predictability so integral to admiralty law because its application would be "dependent on whether, on any given day, commercial maritime activity is being conducted on the waters." *Price*, 929 F.2d at 134; *see also Aqua* Log, 709 F.3d 1055, 1061 (11th Cir. 2013) ("A test that requires evidence of actual or likely commercial activity fails to provide the predictability that encourages maritime commerce."). For this reason, we have found admiralty jurisdiction even over waters used exclusively for recreational navigation when they were capable of commercial navigation. *E.g.*, *Price*, 929 F.2d at 134–35; *Mullenix*, 984 F.2d at 104.

These same principles of uniformity and predictability apply to assessing the depth of navigable waters as well.[*] We have thus held that "the boundary of admiralty jurisdiction in tidal areas does not ebb and flow with the tide but extends to the mean high water mark at all times" because it should not matter whether an injury occurred one step into or one

---

[*] We note that the district court's determination that Eli Cove was no more than five feet deep is at odds with the charts in the record. Upon closer inspection of the National Oceanic and Atmospheric Administration chart, the parties agreed at oral argument that the chart seems to state that the depth of the cove is *at least* five feet. *See* J.A. 46.

7

step out of the water's edge at a given moment. *Hassinger*, 781 F.2d at 1026–27. Indeed, we have found admiralty jurisdiction over torts taking place on land when they fell within the mean high-water mark of the tide. *E.g.*, *id.*

A jurisdictional rule that required courts to assess the residential-ness versus commercial-ness—or the depth at each point along a continuous water route—would be unworkable and generate a patchwork of state law jurisdiction and admiralty law jurisdiction along the same body of water. That cannot be, and fortunately is not, our rule.

## B.

In addition to satisfying conditions of location, a claimant invoking the court's admiralty jurisdiction must show that the incident had some connection to maritime activity. *Price*, 929 F.2d at 135; *Grubart*, 513 U.S. at 534. The purpose of this so-called "connection test" is to weed out cases "occurring on navigable waters, but lacking maritime flavor." 1 Admiralty & Mar. Law § 3:5. The connection test has two requirements: (1) the incident must have a potentially disruptive impact on maritime commerce and (2) the activity giving rise to the incident must bear a substantial relationship to traditional maritime activity. *Grubart*, 513 U.S. at 534. We find both conditions met here.

## 1.

The incident underlying this action was plainly "of a sort with the potential to disrupt maritime commerce." *Grubart*, 513 U.S. at 538. "The jurisdictional inquiry does not turn on the [incident's] *actual* effects on maritime commerce" or "the particular facts" of the case. *Sisson v. Ruby*, 497 U.S. 358, 363 (1990). Instead, the court has looked to its "general

8

features" to determine whether it falls "within a class of incidents that pose[] more than a fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 538–39.

In *Sisson v. Ruby*, for example, the Supreme Court held that "a fire on a vessel docked at a marina on navigable waters" "[c]ertainly" had a "potentially disruptive impact on maritime commerce" because the fire could have "spread to nearby commercial vessels or ma[d]e the marina inaccessible to such vessels," even though there were no commercial vessels in the marina at that time. 497 U.S. at 362–63. "To speak of the incident as 'fire' would have been too general," yet to describe it as a fire "damaging nothing but pleasure boats and their tie-up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby." *Grubart*, 513 U.S. at 538–39. Thus the Court used an "intermediate level" of generality, *id.* at 538, and described the incident as "a fire on a vessel docked at a marina on navigable waters," *Sisson*, 497 U.S. at 363.

Turning to the present case, the incident may be fairly characterized as damage to an underwater cable by a barge. The question thus becomes whether the incident described "could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." *Grubart*, 513 U.S. at 539.

To ask the question is to answer it. Electricity and water are a dangerous combination. The striking of an underwater electric cable could plausibly lead to an electrical fire, an explosion, or electrocution of those on board a vessel or in the waters around. And in response to such exigencies on navigable waters, the Coast Guard and other commercial rescue vehicles would be called upon to render aid. Supreme Court precedent

9

confirms that "damage by a vessel in navigable water to an underwater structure . . . is the kind of incident that has a 'potentially disruptive impact on maritime commerce.'" *Grubart*, 513 U.S. at 539; *see also, e.g.*, *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465 (5th Cir. 1991) (admiralty case where a vessel struck an underwater pipeline); *Orange Beach Water, Sewer, & Fire Prot. Auth. v. M/V Alva*, 680 F.2d 1374 (11th Cir. 1982) (same).

At oral argument, Coastline stressed the lack of disruption to maritime commerce arising from this particular incident. Coastline argued that the lack of any adverse consequences to anything but the cable itself meant that the risks put forth above were "fanciful" and "speculative." But our test is not one of actual disruption, but rather one of potential disruption. And Coastline's proposed application would read the word "potential" right out of it.

For the reasons discussed, we find that the general features of the incident here posed a sufficient risk of disruption to maritime commerce, though fortunately none occurred.

### 2.

We turn finally to "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 539. The complaint alleged that Coastline struck the cable while transporting a barge full of tools and materials to begin construction on the Owners' pier. *See id.* at 540 (describing the "activity giving rise to the incident" as "repair or maintenance work on a

navigable waterway performed from a vessel"). So described, Coastline's activity not only bears a substantial relationship to traditional maritime activity. It is the epitome of it.

Indeed, the Supreme Court has held that the navigation of vessels in navigable waters is substantially related to maritime activity. *See Foremost*, 457 U.S. at 674–75 ("Because the 'wrong' here involves the negligent operation of a vessel on navigable waters, we believe that it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court."); *see also Grubart*, 513 U.S. at 540 (finding there was "no question that the activity" of "repair or maintenance work on a navigable waterway performed from a vessel" was "substantially related to traditional maritime activity").

Traditional maritime activity cannot be narrowed to particular classes of vessels or specific kinds of repairs. Finding no meaningful distinction from *Foremost* and *Grubart*, or from our own line of precedent, we hold that admiralty jurisdiction plainly lies. We thus reverse the judgment of the district court and remand the case for further proceedings.

*REVERSED AND REMANDED*