Steven K. JOHNSON, et al., Plaintiffs,

v.

COLONIAL PIPELINE COMPANY, Defendant.

Civ. A. No. 93–446–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 14, 1993.

**310**

Marc Allan Bushman, Neville Paul Crenshaw, Bushman & Bushman, Fairfax, VA, for plaintiffs.

John Jay Range, Hunton & Williams, Washington, DC, for defendant.

## MEMORANDUM OPINION

HILTON, District Judge.

This matter came before the court on the defendant's Motion to Dismiss or in the alternative for Summary Judgment. The court ruled from the bench granting defendant's motion on June 4, 1993 and entered an order dismissing this case on June 15, 1993. The court now issues this memorandum opinion to amplify its previously stated reasons.

Plaintiffs seek injunctive relief, economic losses, and other damages suffered as a result of the release of oil in the vicinity of their property in Loudoun County, Virginia on March 28, 1993.

Colonial owns and operates an interstate, overland pipeline system that transports petroleum products from Texas to New York.

On March 28, 1993, Colonial's 36-inch pipeline ruptured near the parking lot of Reston Hospital in Reston, Virginia. Some of the fuel oil from the pipeline spread overland to a creek known as Sugarland Run, which is located approximately 200 yards from the point of the rupture. Sugarland Run is a tributary of the Potomac River.

Plaintiffs filed their complaint in this case on April 2, 1993. They filed their First Amended Complaint on May 6, 1993. The suit contains seven counts: (1) violation of the Oil Pollution Act of 1990; (2) violation of the Virginia State Water Control Law; (3) maritime negligence; (4) common law trespass; (5) private nuisance; (6) public nuisance; (7) punitive damages. Plaintiffs assert federal jurisdiction on the basis of diversity jurisdiction, admiralty and maritime jurisdiction, federal question jurisdiction, and principles of supplemental jurisdiction.

### I. Oil Pollution Act

The federal statutory violation alleged by plaintiffs is the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.* ("OPA"). OPA provides that all claims for damages shall be presented first to the party responsible for the spill. *See* 33 U.S.C. § 2713(a). If such a claim is presented *and* the responsible party denies all liability or the claim is not settled within 90 days, the claimant may elect to commence an action in court against the responsible party. *See* 33 U.S.C. § 2713(c). If plaintiffs fail to comply with the prerequisites for bringing such a claim, the OPA claim must be dismissed. *Cf. Hallstrom v. Tillamook County,* 493 U.S. 20, 31, 110 S.Ct. 304, 311, 107 L.Ed.2d 237 (1989) (plaintiff's failure to comply with Resource Conservation and Recovery Act's 60-day notice and presentation requirement mandates dismissal of case).

The purpose of the claim presentation procedure is to promote settlement and avoid litigation. Congress believed that lawsuits against parties are appropriate only "where attempts to reach a settlement with the responsible party ... were unsuccessful." H.R.Rep. No. 242, 101st Cong., 1st Sess., pt. 2, at 66 (1989). It therefore mandated a 90-day period in which the parties would at-

tempt to resolve monetary disputes arising from oil spills prior to commencing litigation. The hope was to avoid costly and cumbersome litigation. *See* 135 Cong.Rec. at H 7962, 7965 (statements of Rep. Hammerschmidt and Rep. Lent).

In this case, plaintiffs have not complied with the presentation requirement of OPA. They filed this suit on April 2, 1993 without having first presented a claim to Colonial. Thereafter, apparently realizing their failure to comply, plaintiffs sent a letter to Colonial on April 7, 1993, which purports to present an OPA claim. However, the April 7 letter fails to cure the jurisdictional defect for two reasons.

First, Colonial has not denied all liability under OPA and 90 days have not passed since the claim was presented. At least one of these events must occur before an OPA action may proceed.

Second, the plaintiffs' April 7 letter fails to "present" a claim within the meaning of 33 U.S.C. § 2713(a). As noted, the purpose of OPA's claim presentation requirement is to enable the parties to negotiate, if possible, a settlement of potential claims resulting from an oil spill without having to resort to litigation. The settlement is to be in the form of "payment within 90 days after the date upon which the claim was presented." 33 U.S.C. § 2713(c)(2). In order to accomplish this purpose, the claim presented must inform the responsible party with some precision of the nature and extent of the damages alleged and of the amount of monetary damages claimed. Otherwise, the responsible party will be unable to make an informed offer of its own, unable to engage in meaningful substantive negotiations, and thus unable to settle the matter by agreeing to a final amount. Instead, the responsible party will have to ask for a more definite statement of the claim, as Colonial has done here, and the 90-day period will be spent trying to obtain basic information rather than actually negotiating a settlement.

The need for specificity in OPA claims is underscored by the regulations issued by the United States Coast Guard pursuant to OPA setting forth the requirements for filing such claims against the OPA Fund. *See* 57 Fed. Reg. 36314 (1992) (codified at 33 C.F.R. pt. 136). The Coast Guard regulations state that a claim must provide, *inter alia*, a general description of the nature and extent of the impact of the oil spill and the associated damages, a list of the damages with a "sum certain" attributed to each type of damage listed, and evidence to support the claim. *See* 33 C.F.R. §§ 136.105, 136.109.

Measured against the purposes of the OPA claims presentation procedure, as well as the Coast Guard regulations, the plaintiffs' April 7 letter is plainly inadequate. The letter conclusorily recites that the claim is for "damages for injury to or economic losses resulting from the destruction of rent property owned by the claimants," as well as for loss of income, elimination of property value, mental distress, loss of use and enjoyment of property, loss of quality of life, and disruption. Plaintiffs make no effort to describe the nature or extent of these alleged damages, much less to explain the basis for claiming that these damages have been sustained. They fail to state a sum certain for any of the types of damages alleged. Indeed, they do not give any suggestions as to the amount of damages they are claiming.

Plaintiffs' letter does not provide Colonial with enough information to accept the claim and make a payment that will settle the matter, or even to formulate an offer of its own that might lead to settlement. Thus, Colonial is unable to negotiate meaningfully with plaintiffs, as it has done with other claimants, many of whose claims have been resolved. Plaintiffs' letter is simply an afterthought, sent to Colonial after plaintiffs had already sued in the hope of curing a profound jurisdictional defect.

Plaintiffs have thus never "presented" their claims as required by OPA. Even if they had, they could not maintain this lawsuit because Colonial Pipeline has not denied all liability and the 90-day negotiating period has not expired. Count I therefore must be dismissed.

## II. Diversity Jurisdiction

Because this court lacks federal question jurisdiction under 28 U.S.C. § 1331, the supplemental state claims must be dismissed

unless the plaintiffs can satisfy the requirements of diversity jurisdiction under 28 U.S.C. § 1332 or admiralty or maritime jurisdiction under 28 U.S.C. § 1333.

■ Even though Colonial Pipeline is incorporated in Virginia, plaintiffs argue that this court possesses diversity jurisdiction because its Virginia incorporation was an involuntary addition to its incorporation in Delaware. To conduct business in Virginia, a foreign corporation must merely register with the State Corporation Commission. *See* Va.Code § 13.1–759. However, a foreign corporation must reincorporate in Virginia in order to act as a public service company. *See* Va. Const., art. IX, § 5 and Va.Code § 56–49. To enable Colonial to obtain the privilege of exercising the power of eminent domain, the company formed a wholly-owned subsidiary in Virginia pursuant to the constitutional requirement which was formerly codified as § 163 of the Virginia Constitution. *See Colonial Pipeline Company v. Commonwealth of Virginia,* 206 Va. 517, 519, 145 S.E.2d 227, 229 (1965). The United States Supreme Court has held that reincorporation pursuant to § 163 of the Virginia Constitution voluntarily relinquishes federal diversity jurisdiction. *Railway Express Agency, Inc. v. Virginia,* 282 U.S. 440, 444, 51 S.Ct. 201, 202, 75 L.Ed. 450 (1931) (Holmes, J.). This court therefore lacks diversity jurisdiction because both plaintiffs and the defendant are citizens of the Commonwealth of Virginia. *Accord Donahue v. Colonial Pipeline Company,* Civil Action No. 87–207–N (E.D.Va. 1987) (MacKenzie, J.).

### III. Maritime and Admiralty Jurisdiction

■ This court lacks maritime and admiralty jurisdiction because the pipeline leak did not occur on navigable waters and plaintiffs' tort claims bear no significant relationship to maritime activity. Admiralty jurisdiction is rooted in the existence of the law of admiralty that has evolved over the centuries to deal with special kinds of disputes, those arising from navigation of the seas. *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 269–70, 93 S.Ct. 493, 505, 34 L.Ed.2d 454 (1972); *See also Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990).

When this special body of law is invoked under admiralty jurisdiction, it tends to preempt state regulation of matters that otherwise would fall within the ambit of local control. *See Oman v. Johns–Manville Corp.,* 764 F.2d 224, 227 (4th Cir.1985), *cert. denied,* 474 U.S. 970, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985). For this reason, federal courts exercise admiralty jurisdiction restrictively, with a searching inquiry to determine whether the underlying rationale for such jurisdiction—the need to apply a unique body of law in cases involving truly maritime matters—exists. *Id.* at 227–228.

■ An action for tort is cognizable under federal admiralty jurisdiction only if it satisfies both the (1) *locus* test—the wrong occurred on navigable waters and the (2) *nexus* test—the wrong bears a significant relationship to a maritime activity. *Holland v. Sea–Land Services, Inc.,* 655 F.2d 556, 558 (4th Cir.1981) (federal admiralty jurisdiction governs only those torts occurring on navigable waters and "does not embrace accidents on land"), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); *Price v. Price,* 929 F.2d 131, 133 (4th Cir.1991).

Plaintiff's action fails to satisfy the *locus* test because the alleged wrong did not occur on navigable waters. "[N]avigable water for purposes of admiralty jurisdiction [is] a body of water which, in its present configuration, constitutes a highway of commerce, alone or together with another body of water, between the states or with foreign countries over which commerce in its current mode is capable of being conducted." *Alford v. Appalachian Power Co.,* 951 F.2d 30, 32 (4th Cir.1991). *See also Price,* 929 F.2d at 134 (quoting definition of navigable waters in *The Daniel Bell,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870), that waters are navigable "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water").

■ Nothing in the record indicates that Sugarland Run "constitutes a highway of commerce" over which trade and travel may be conducted. Plaintiffs merely assert that

the spill "devastated the fish population and biota of Sugarland Run." This alleged injury to fish and "biota" is irrelevant. Assuming *arguendo* that fish in the lakes in *Price* and *Alford* had suffered similar devastation that plaintiffs allege occurred in Sugarland Run, those bodies of water would not have been suddenly transformed into the navigable waters of the United States. It was the absence of interstate commerce in *Alford* and its presence in *Price* that determined whether the lakes were navigable. *Compare Alford*, 951 F.2d at 33 *with Price*, 929 F.2d at 135. Moreover, the fact that plaintiffs allege that they suffered injury on their properties and not on navigable waters also implies that this action fails to satisfy the *locus* test. *See Dean v. Maritime Overseas Corp.*, 770 F.Supp. 309, 312 (E.D.La.1991) (for purposes of establishing maritime jurisdiction, a tort takes place where the alleged negligence took effect, *i.e.*, where the plaintiffs sustained their injuries).

■ Regarding the *nexus* prong required to support admiralty jurisdiction, four factors determine whether a tort bears sufficient relationship to traditional maritime activity: (1) the functions and roles of the parties, (2) the types of vehicles and instrumentalities involved, (3) the causation and type of injury, and (4) traditional concepts of the rules of admiralty law. *Oman*, 764 F.2d at 230. The last factor—traditional concepts of the role of admiralty law—is the most important one. *Id.* at 231.

In this case, none of the four factors favors admiralty jurisdiction. Plaintiffs are residential property owners. Colonial is the operator of a land-based pipeline. Neither performs a function related to maritime activity. Similarly, the instrumentality involved, a land-based interstate pipeline, is not maritime in nature.

The type of injuries alleged in this action are damage to residential property and property values, along with potential health damages from exposure to toxic fumes. Such injuries are not of an inherently maritime nature. To the contrary, the alleged injuries were caused by a fuel oil spill on land. Although the fuel oil eventually found its way into a creek, the root cause of the injury was a non-maritime event involving a non-maritime instrumentality. The fact that the

leaked oil happened to reach the creek is not enough to confer admiralty jurisdiction. *See Ancarrow v. Richmond*, 600 F.2d 443, 445 (4th Cir.1979), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979) (the alleged pollution of the James River and damages to adjoining landowners caused by a sewage plant does not involve traditional maritime jurisdiction and does not confer admiralty jurisdiction); *Yates v. Island Creek Coal Co.*, 485 F.Supp. 995, 997 n. 4 (W.D.Va.1980) (no admiralty jurisdiction over claim for damages caused by the flooding of navigable waters resulting from strip mining).

Plaintiffs ignore the Fourth Circuit's four-part test and simply assert that "by its very nature, an oil spill on navigable waters inherently" meets the maritime activity test. The only authority plaintiffs cite are oil spill cases involving seagoing vessels that spilled oil directly into navigable waters. *In re Exxon Valdez*, 767 F.Supp. 1509, 1512 (D.Alaska 1971) (damage claims cognizable because they were "caused by a vessel on navigable water"); *Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *U.S. v. Bear Marine Service*, 509 F.Supp. 710, 717 (E.D.Cal.1980); *Burgess v. M/V Tamano*, 370 F.Supp. 247 (D.Me.1973); *Maryland Dept. of Natural Resources v. Amerada Hess Corp.*, 356 F.Supp. 975 (D.Md.1973). In each of these cases, in contrast to this case, the defendant was engaged in shipping, the most traditional maritime activity. Also, the instrumentality involved was a vessel and the alleged injury was either directly to the water or was caused by a vessel on navigable waters. None of these factors is present in this case. Plaintiffs cannot point to anything about this case that requires the special expertise of a court in admiralty on issues regarding navigation and water-based commerce. Oil spills from overland pipelines cannot be viewed as traditional maritime activity.

Most fundamentally, this dispute involves no interests that are associated with the purposes of maritime law. It has nothing to do with such traditional maritime concerns as shipping, navigational rules, the law of the seas, maritime liens, captures and prizes, cargo damage, or claims for salvage. *See Executive Jet Aviation*, 409 U.S. at 249, 93

S.Ct. at 493 (denying admiralty jurisdiction in suit in which airplane fortuitously crashed into Lake Erie after hitting flock of seagulls because flying is not traditional maritime activity). Here the pipeline rupture occurred on land, the fuel oil traveling overland to water was merely fortuitous, and the activity (sending oil through an overland pipeline) is not traditional maritime activity. Accordingly, this Court lacks admiralty jurisdiction because plaintiff's claims lack the " 'salty' flavor necessary to support" it. *See Dean*, 770 F.Supp. at 313.

Plaintiffs have failed to meet the jurisdictional requirements for diversity, admiralty, or federal question jurisdiction. Lacking any valid basis for federal jurisdiction, supplemental jurisdiction does not exist to adjudicate the state law claims. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Counts II, III, IV, V, VI, and VII must therefore be dismissed.

The defendant has also raised the issue of whether certain plaintiffs have standing. In light of the court's jurisdictional ruling, the standing issue need not be addressed.

For the foregoing reasons, this case was DISMISSED.