# Funds Available for Payment of Natural Resource Damages Under the Oil Pollution Act of 1990

The President, acting through the Department of Transportation, is authorized to use the Oil Spill Liability Trust Fund to pay the claims of Natural Resource Trustees for uncompensated natural resource damages in accordance with section 1013 of the Oil Pollution Act of 1990, without the need for further enactment of appropriations.

September 25, 1997

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

This responds to your memorandum of May 28, 1997, requesting this Office to resolve a dispute among several federal departments concerning section 1012 of the Oil Pollution Act of 1990, Pub. L. No. 101–380, 104 Stat. 484, 498 (codified at 33 U.S.C. §§ 2701–2761 (1994)) ("OPA" or "the Act").[1] We conclude that the President, acting through the Department of Transportation, is authorized to use the Oil Spill Liability Trust Fund ("Fund") under section 1012(a)(4) of OPA to pay the claims of Natural Resource Trustees for uncompensated natural resource damages in accordance with section 1013 of OPA, without the need for further appropriation.

## I. BACKGROUND

### A.

OPA established a comprehensive regulatory framework for a coordinated intergovernmental response to oil spills that threaten U.S. resources or occur on or near U.S. navigable waters. See 33 U.S.C. §§ 2701–2761. A key component of the Act is its provision for the designation of federal, state, tribal, and foreign natural resource trustees ("Trustees") who have authority to recover damages for injury to, destruction of, loss of, or loss of the use of natural resources under their trusteeship, including the reasonable costs of assessing the damage. *Id.* §§ 2702(b)(2)(A), 2706(b).[2] OPA further provides that the functions of Trustees are to assess natural resource damages and to develop and implement plans for

---

[1] Because this dispute is between executive branch departments, and its resolution will affect the position taken by the Department of Justice in litigation, it is appropriate for resolution by this office See Exec Order No 12146, 3 C.F.R. 409 (1980), *reprinted in* 28 U.S.C § 509 note (1994), 28 C.F.R § 0 25 (1996) The positions asserted by the several involved departments are discussed in Section I B, *infra*

[2] *See also* 33 U.S.C § 2701(20) (1994), which provides.

'natural resources' includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government

188

the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship. *Id.* § 2706(c).

The party found responsible for a spill ("responsible party," *see id.* § 2701(32)) is liable for removal costs and damages specified in the Act. *Id.* § 2702(b)(1)–(2). Among the damages specified are "natural resource damages." The Act further provides that only Trustees, the statutory custodians of the affected natural resources, may recover natural resource damages from a responsible party, either by settlement or litigation. *Id.* § 2702(b)(2)(A).

Section 1013 of OPA provides the procedural framework for the presentation and processing of claims for removal costs or damages. 33 U.S.C. § 2713. After preparing an assessment of damages, claimants must, in general, first present their claims for removal costs and damages to the responsible party for consideration of settlement. If the claim is not settled within 90 days after presentment, the claimant may either sue the responsible party in court or "present the claim to the [Oil Spill Liability Trust] Fund." *Id.* § 2713(a), (c)(2). The presentation and disposition of claims against the Fund pursuant to section 1013 is governed by detailed regulations and is subject to administrative adjudication. *Id.* § 2713(e); 33 C.F.R. pt. 136 (1996). In pursuing a claim against the Fund, "[t]he claimant bears the burden of providing all evidence, information, and documentation deemed necessary by the Director, NPFC [National Pollution Funds Center], to support the claim." *Id.* § 136.105(a). Among other information, the written claim must include a description of the oil spill and "the nature and extent of the impact of the incident" on the claimant; a statement of damages claimed; "[a]n explanation of how and when the [claimed] damages were caused" and what steps were taken to mitigate those damages; supporting evidence; a list of relevant witnesses to the incident and the damages, with a description of each witness's relevant knowledge; information confirming that the claim was first submitted to the responsible party; and any other information deemed relevant by the National Pollution Funds Center ("NPFC") of the U.S. Coast Guard. *Id.* § 136.105.

OPA provides that the Oil Spill Liability Trust Fund is "available to the President" for designated categories of payments. 33 U.S.C. § 2712(a). The Fund, originally created in 1986 as a separate account within the Treasury, has been funded by a five-cent per barrel fee on domestic and imported oil, by civil and criminal penalties, and by other cost recoveries.[3] It is administered by the NPFC under the authority of the Secretary of Transportation. Section 1012(a) of OPA authorizes five separate uses of the Fund, of which the following two lie at the heart of this dispute:

The Fund shall be available to the President for—

---

[3] *See* section 8033(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L No. 99–509, 100 Stat. 1874, 1959–62 (codified at 26 U.S.C § 9509(a) (1994)), 26 U.S C. § 4611(a)–(c) (1994); *id* § 9509(b)(2), (5) (1994)

> (2) the payment of costs incurred by Federal, State, or Indian tribe trustees in carrying out their functions under section 2706 of this title for assessing natural resource damages and for developing and implementing plans for the restoration, rehabilitation, replacement, or acquisition of the equivalent of damaged resources determined by the President to be consistent with the National Contingency Plan; [and]
>
> . . . .
>
> (4) the payment of claims in accordance with section 2713 [section 1013 of OPA] of this title for uncompensated removal costs determined by the President to be consistent with the National Contingency Plan or uncompen-sated damages.

33 U.S.C. § 2712(a)(2), (4).

For most of the purposes authorized by section 1012 — including the payment under section 1012(a)(2) of "costs incurred" by domestic Trustees in carrying out their functions under section 1006 of OPA — payments may be made from the Fund "only as provided in annual appropriation Acts." 33 U.S.C. § 2752(a) (1994 & Supp. III 1997). Several specified categories of payments, however, may be made directly out of the Fund without the need for further appropriation by Congress. One of those excepted categories is the payment of claims pursuant to section 1012(a)(4), which authorizes the payment of claims in accordance with section 1013. *See* OPA § 6002(b), 33 U.S.C. § 2752(b).

The President has delegated, by Executive Order, the functions vested in him respecting management and use of the Fund. Exec. Order No. 12777, 3 C.F.R. 351 (1992) ("Exec. Order"). His functions regarding the payment of removal costs and claims under section 1012(a)(1), (3), and (4) have been delegated to the Secretary of Transportation ("the Department in which the Coast Guard is operating"). Exec. Order § 7(a)(1)(A), 3 C.F.R. at 357. His functions respecting the payment of "costs incurred" under section 1012(a)(2), on the other hand, have been delegated "to the Federal trustees designated in the [National Contingency Plan]." *Id.* § 7(a)(2), 3 C.F.R. at 357.

## B.

As summarized in your memorandum, the Department of Transportation ("DOT")[4] contends that payments from the Fund to federal, state, and Indian tribe Trustees for natural resource damages may only be made under the provi-

---

[4] Except where otherwise specified, we refer collectively herein to the Department of Transportation, the Coast Guard, and the National Pollution Funds Center as "DOT."

sions of section 1012(a)(2), and thus require an annual appropriation before they can be made. On the other hand, the Federal agencies designated as Trustees — including the National Oceanic and Atmospheric Administration ("NOAA") of the Department of Commerce, the Department of the Interior, and the Department of Defense — assert that such damages may be compensated, as appropriate, either as a "cost incurred" under section 1012(a)(2), or as a claim for "uncompensated damages" under section 1012(a)(4). Payment under section 1012(a)(2) requires an annual appropriation, while payment under section 1012(a)(4) of a claim, established in accordance with section 1013, does not.

Before reaching its current position on Trustee access to the Fund, the Coast Guard issued an "interim rule" governing the filing of claims authorized to be presented against the Fund under section 1013 of OPA. *See* Claims under the Oil Pollution Act of 1990, 57 Fed. Reg. 36,314 (1992) (codified at 33 C.F.R. pt. 136 (1996)). With respect to claims against the Fund for natural resource damages, the Coast Guard regulations provide in relevant part: *"Authorized claimants.* (a) Claims for uncompensated natural resource damages may be presented by an appropriate natural resources trustee." 33 C.F.R. § 136.207(a). Thus, the interim regulations characterize natural resource Trustees as "authorized claimants" for purposes of filing claims against the Fund pursuant to section 1013. The rule goes on to provide detailed requirements for a Trustee's natural resource damages claims against the Fund, including specific requirements for submitting "the assessment and restoration plans which form the basis of the claim," *id.* § 136.209(a).

Although the interim rule suggests that Trustees may pursue claims against the Fund for natural resource damages, the preamble to the rule explains that it is "an interim measure needed primarily to explain how eligible claimants may file a claim against the [Fund]," and that "a more comprehensive rule may be developed and published for public comment." 57 Fed. Reg. at 36,314. The preamble to the rule further explains:

> Legal issues concerning whether, under section 1013, Federal, State or Indian tribe trustees can claim against the Fund for natural resources damages and whether Federal agencies can claim against the Fund for any costs or damages have been raised. These issues are presently under review. This interim rule does not resolve these issues and leaves the matter open for future decision.

*Id.* at 36,315. Accordingly, little guidance can be taken from the only implementing regulations promulgated to date.

In an attempt to resolve the question left open by the interim rule, in December of 1993, the Coast Guard asked the Comptroller General for an opinion addressing whether Trustees could present claims against the Fund under section 1012(a)(4).

In response, the Comptroller General issued an opinion concluding that "natural resources trustees may be reimbursed from the Fund for costs incurred for damage assessments and the development and implementation of restoration plans only under section 1012(a)(2) of the [OPA], subject to the annual appropriations process. Section 1012(a)(4) of OPA is not available to natural resources trustees for claims for damages." *Matter of U.S. Coast Guard—Oil Spill Liability Trust Fund,* B–255979, 1995 WL 632510, at *1 (C.G. Oct. 30, 1995) ("CG Op.").[5]

The Coast Guard then sent letters to federal and other Trustees stating that the Comptroller General's opinion precluded the Coast Guard from entertaining Trustee claims against the Fund under section 1012(a). The Coast Guard stated in one such letter:

> As a consequence of the Comptroller General's decision, the Trustees can no longer rely upon OPA's claims process as a backup should responsible parties be unavailable to pay for natural resource damages resulting from their oil spills. And, the National Pollution Funds Center has no choice but to return all natural resource damage claims to their submitters without adjudication. Those claims held in abeyance pending the Comptroller General's decision will be returned shortly under a separate cover.[6]

Subsequently, the Coast Guard has declined to entertain section 1013 claims against the Fund made by Trustees seeking compensation for natural resource damages. The Coast Guard's rejection of such claims is presently being contested in litigation brought by State Trustees who have been denied their claims against the Fund. *See New York v. Oil Spill Liability Trust Fund,* No. 96 Civ. 1951 (E.D.N.Y. filed Apr. 24, 1996); *Wetherell v. National Pollution Funds Center,* No. 4:96CV517/MP (N.D. Fla. filed Dec. 6, 1996). You seek resolution of the inter-agency dispute over the proper interpretation of section 1012's provisions for allowable payments from the Fund in order to formulate the legal position of the United States in the litigation involving Trustees' access to the Fund.

## II. ANALYSIS

### A.

The starting point for resolving disputes concerning the interpretation of a statute is, of course, the text of the statute itself. *See United States v. Ron Pair*

---

[5] Although the opinions and legal interpretations of the Comptroller General often provide helpful guidance on appropriation matters, they are not binding upon departments or agencies of the executive branch. *See Bowsher v Synar,* 478 U.S. 714, 727–32 (1986)

[6] Letter for Ms Debra Preble, from Daniel F Sheehan, Director, National Pollution Funds Center, *Re. Natural Resource Damage Claims* at 1 (Dec 21, 1995)

*Enterprises, Inc.* 489 U.S. 235, 241 (1989). Here, the text of the statute seems plainly to authorize natural resource trustees to pursue claims for natural resource damages and to recover directly from the Fund, without requiring a separate appropriation, where they have established a valid claim under section 1013 of the Act. Section 1012(a)(4) of the Act authorizes "the payment of claims in accordance with section [1013 of the Act] for uncompensated . . . damages," 33 U.S.C. § 2712(a)(4), and section 6002 of the Act provides that a separate appropriation is not required for payments made pursuant to section 1012(a)(4), *see* 33 U.S.C. § 2752. A "claim" is defined to include a written request for payment "for compensation for damages," *id.* § 2701(3), and, in turn, a "'claimant' means any person *or government* who presents a claim for compensation" under the Act, *id.* § 2701(4) (emphasis added).[7] Finally, the term "damages" is defined to include damages to "natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a *United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee.*" *Id.* §§ 2701(5), 2702(b)(2)(A) (emphasis added).

Congress expressly authorized a claimant under section 1013 to present a claim to the Fund in three separate provisions: once in section 1013(c), once in section 1013(d), and once again in section 1012(a)(4). None of those provisions indicate, or in any way suggest, that Trustees are excluded from the category of claimants to which they apply. Nor is there any ambiguity as to which provision of section 1012 governs the payment of such claims. Section 1012(a)(4) expressly governs "the payment of claims *in accordance with section [1013]*" (emphasis added), whereas section 1012(a)(2) makes no reference to the section 1013 claims procedure.

The various provisions authorizing payments from the Fund under section 1012, moreover, were drawn with considerable precision. For example, Congress specified that only costs incurred by "Federal, State, or Indian tribe trustees" — but not *foreign* trustees — could be paid pursuant to section 1012(a)(2). Had the congressional drafters similarly intended to exclude Trustees from the class of claimants eligible to receive payments on their claims under section 1012(a)(4) — a class that would naturally encompass Trustees under the straightforward definitions of the statute — it seems unlikely that they would have left such a significant exclusion to be inferred. Rather, the exclusion of Trustees' claims could have been readily and unambiguously achieved by inserting a single phrase in subsection (a)(4) — by selectively authorizing, for example, "(4) the payment of claims, *other than payments otherwise authorized under subparagraph (a)(2) of this section,* in accordance with section 2713 of this title." Congress refrained, however, from drawing any such distinction.

---

[7] It does not appear to be in dispute that OPA's definition of "claimant" includes Trustees who present a claim for natural resource damages compensation under section 1013 of the Act

The text of OPA, accordingly, seems clearly to provide that the Fund may be used to pay the claims of Trustees, pursuant to the provisions of sections 1012(a)(4) and 1013, without the requirement for annual appropriations.

**B.**

DOT interprets the relevant provisions of OPA in a different manner. DOT asserts that, because section 1012(a)(2) of OPA separately authorizes Fund payments to Trustees for "costs incurred," and because such costs overlap to a large extent with the removal costs and uncompensated damages that may form the basis of a claim under section 1012(a)(4), there is a conflict or inconsistency between the two provisions if the latter also applies to Trustees. This asserted inconsistency derives from the related provisions of section 6002, 33 U.S.C. § 2752, which make "costs incurred" payments under section 1012(a)(2) contingent on further appropriations, whereas the payment of perfected claims under section 1012(a)(4) may be paid directly from the Fund without more. In essence, DOT contends that Congress could not have intended to exempt Fund payments to Trustees under subsection (a)(4) from the fiscal discipline of the annual appropriations requirement that applies to payments for their costs incurred under subsection (a)(2).

**1.**

DOT first argues that section 1012(a)(4)'s explicit provision for use of the Fund to pay claims presented by Trustees and other claimants pursuant to section 1013 must give way to principles of appropriations law applied in rulings of the Comptroller General. Letter for Mr. Charles A. Bowsher, Comptroller General, from Adm. J. W. Kime, Commandant, U.S. Coast Guard at 3 (Dec. 6, 1993) ("Coast Guard Ltr."). Invoking the analysis used by the Comptroller General in his 1995 ruling in this dispute, DOT likens the payment authorization of section 1012(a)(4) to a general appropriation which cannot be used to fund payments covered by a more specific appropriation, in the form of section 1012(a)(2)'s provision for payment of costs incurred by Trustees. Coast Guard Ltr. at 2. Specifically, DOT relies upon the following principle of statutory construction applied by the Comptroller General in his opinion on access to the Fund:

> Where there is a seeming conflict between a general provision and a specific provision and the general provision is broad enough to include the subject to which the specific provision relates, the specific provision should be regarded as an exception to the general provision so that both may be given effect, the general applying only where the specific provision is inapplicable.

CG Op. at 4 (quoting B–163375, 1971 WL 5205 (C.G. Sept. 2, 1971)).

Initially, we note that the specific/general principle relied upon by DOT is but a canon of statutory construction, which, like other such rules, must yield to superior evidence of legislative intent. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992); *Rubin v. United States*, 449 U.S. 424, 430 (1981). Here, not only the plain meaning of the statute, but other indicia of statutory intent counsel against the construction proposed by DOT. The principal basis proferred by DOT for precluding federal, state, and Indian tribe trustees from recovering pursuant to section 1012(a)(4), for example, is that they are expressly entitled to recover costs incurred pursuant to section 1012(a)(2). That section, however, by its own terms does not apply to foreign trustees, and thus, under DOT's reasoning, foreign trustees may still recover under section 1012(a)(4), without the discipline of a further appropriation. It seems highly improbable, however, that Congress intended to provide foreign trustees more liberal access to the Fund than it provided to domestic trustees.

The most fundamental difficulty with DOT's argument, however, concerns its critical premise: we do not find an irreconcilable conflict or inconsistency, *see* CG Op. at 4, between the payment provisions of subsections (a)(2) and (a)(4), even taking into account their relationship with the appropriations provisions of section 6002 of the Act. Absent such a conflict or inconsistency, or other compelling indicia of contrary congressional intent, there is no need or justification to depart from a straightforward application of the statutory text.

Although compensable "costs incurred" under subsection (a)(2) concededly overlap to a large extent with the "uncompensated damages" that may be claimed under subsection (a)(4),[8] there are a number of important distinctions between the two payment provisions. First, the Trustees' access to the Fund under section 1012(a)(4) is specifically limited to those claims that have been pursued "in accordance with section [1013]." That section requires claimants to first present their claims to the responsible party and to wait at least 90 days before submitting a claim to the Fund in order to provide reasonable opportunity for settlement. 33 U.S.C. § 2713(a), (c). Moreover, the payment of claims under section 1013 is subject to detailed regulations governing the presentation, filing, processing, settlement, and adjudication of such claims. *Id.* § 2713(e); 33 C.F.R. pt. 136. Those regulatory requirements include, inter alia, the preparation and presentation of the often costly assessment and restoration plans which form the basis of the claim; a description of damages claimed by category; documented costs and cost estimates for the plan; evidence relating to the spill and the damages; witness lists and descriptions of their knowledge of the incident; certification of the accuracy of claims submitted to the Fund; and certification as to whether the assessment was conducted in accordance with applicable provisions of the natural resources damage assessment regulations. *Id.* §§ 136.105, 136.209. Only if the NPFC deter-

---

[8] For purposes of this opinion, we need not decide whether the overlap is complete or only partial.

mines, after review of the claim, that the claimant has carried its burden of "providing all evidence, information, and documentation deemed necessary . . . to support the claim" is the claimant entitled to payment. *Id.* § 136.105(a).[9]

Consequently, a Trustee's claim that has been prepared and documented (including assessment of damages), presented for settlement to the responsible party, and otherwise perfected in accordance with section 1013's procedures cannot be equated with a direct application for costs incurred under subsection (a)(2).[10] Unlike claims presented under subsection (a)(4), a Trustee seeking payment under subsection (a)(2) need not first present a claim to a responsible party in order to allow the opportunity for settlement. Nor are subsection (a)(2) payment requests governed by 33 C.F.R. pt. 136's detailed evidentiary and adjudication requirements, which in terms apply only to "claims authorized to be presented to the [Fund] *under section 1013* of [OPA]." 33 C.F.R § 136.1(a)(1) (1996) (emphasis added). These requirements, moreover, are important to the overall enforcement scheme established under OPA. The 90-day waiting period, for example, was designed to encourage settlement.[11] Similarly, the evidentiary and adjudicatory provisions set forth in the regulations governing claims presented to the Fund promote fiscal discipline.[12]

In sum, the submission of a subsection (a)(4) claim to the NPFC by a Trustee differs in significant respects from a request for payment under subsection (a)(2). Accordingly, we find no irreconcilable conflict between the provision for these two categories of payments to Trustees.

---

[9] For a case illustrating the application of the 33 C F R pt. 136 regulatory requirements for presentment of a claim under section 1013, *see Johnson v Colonial Pipeline Co.*, 830 F. Supp 309, 311 (E D Va. 1993) (property owner's claim for oil spill damages held inadequate for compliance with the Coast Guard's 33 C F R pt 136 claims regulations and section 1013 requirements, "[t]he need for specificity in OPA claims is underscored by the [Coast Guard] regulations     for filing such claims against the OPA Fund.").

[10] This basic distinction between the payment of costs outside the claims procedure and the payment of claims perfected pursuant to section 1013 was recognized in OPA's legislative history. Thus, the House Report characterized the kind of cost reimbursement that could be obtained outside the claims procedure as "direct uses . . which can be paid from the Fund prior to the presentment and payment of a claim under section 104 of this Act " H R Rep No. 101–242, pt. 2, at 64 (1989) The Senate Report also recognized this distinction between the two modes of payments from the Fund. *See* S. Rep No 101–94, at 10 (1989), *reprinted in* 1990 U S C C A N 722, 731

[11] As recognized by the Eleventh Circuit in *Boca Ciega Hotel, Inc v. Bouchard Transp. Co.*, 51 F 3d 235 (11th Cir 1995), a key purpose of OPA's section 1013 claims procedure — and, in particular, the 90-day waiting period — "was to temper the Act's increased liability with a congressional desire to encourage settlement and avoid litigation " *Id* at 238–39. *Accord Johnson*, 830 F. Supp. at 310–11 ("The purpose of the claim presentation procedure is to promote settlement and avoid litigation ").

[12] We acknowledge that payments authorized under section 1012(a)(2) are also subject to certain statutory and regulatory requirements, notably the requirement that actions be taken in a manner "consistent with the National Contingency Plan." 33 U S C. § 2712(a)(2), *see also* 15 C.F.R. pt. 990 (1996) (NOAA regulations governing natural resource damage assessments as required by section 1006(e)(1) of OPA, 33 U S.C § 2706(e)(1)) These requirements cannot, however, be equated with the mandatory claims exhaustion requirements of section 1013 or the prerequisites for the presentation, proof, and successful adjudication of a claim under the Coast Guard's 33 C F R pt 136 regulations.

**2.**

In a related argument, DOT and the Comptroller General's opinion assert that allowing Fund payments to Trustees under section 1012(a)(4) would effectively render meaningless the provision for payment of their "costs incurred" under section 1012(a)(2). CG Op. at 4–5. By this reasoning, Trustees would invariably bypass the subsection (a)(2) mechanism in favor of the claims provision of subsection (a)(4) because the latter allows the direct payment of damages without the need for further congressional appropriation. This argument is premised on the interpretive canon providing that a statute should not be interpreted in a way that renders portions of it meaningless or ineffective. *See Department of Revenue v. ACF Industries, Inc.*, 510 U.S. 332, 340–41 (1994).

DOT and the Comptroller General, however, have failed to demonstrate that subsection (a)(2) would be rendered meaningless if Trustees were permitted access to the Fund under subsection (a)(4). Before pursuing a claim under section 1013, for example, a claimant must generally present the claim to the responsible party and wait the required 90 days. When submitted, moreover, the claim must be supported by extensive assessment and documentation of the nature and extent of costs and damages, accompanied by certification of the accuracy and integrity of the claim as presented. *See* 33 C.F.R. §§ 136.105 to 136.113, 136.209. Payment of the claim must then await NPFC review, evaluation, and adjudication.

Congress might well have contemplated occasions when Trustees would be better served by seeking payments under subsection (a)(2), rather than comply with these substantial requirements applicable to claims under subsection (a)(4), even though payment under subsection (a)(2) would require a congressional appropriation. For example, a Trustee with limited resources might find it preferable to obtain payment for at least a portion of its allowable costs under subsection (a)(2) rather than complying with the procedural requirements for the presentation and adjudication of a claim against the Fund under section 1012(a)(4). Additionally, if a Trustee's claim is denied by the NPFC under subsection (a)(4) — due to noncompliance with the 33 C.F.R. pt. 136 procedural requirements, for example, *see* 33 C.F.R. § 136.105(a) — it could have a basis for pursuing those portions of its claim that constitute costs incurred under the provisions of subsection (a)(2). Indeed, if Congress were to make available a significant portion of the Fund for payments under subsection (a)(2) in an annual appropriations act, *see* 33 U.S.C. § 2752(a), it seems unlikely that eligible Trustees would bother to pursue payment under sections 1012(a)(4) and 1013 for costs otherwise recoverable under subsection (a)(2) pursuant to the appropriation.

Accordingly, we cannot conclude that the reading of the Act proposed by DOT is necessary to avoid rendering subsection (a)(2) meaningless.

**3.**

DOT also argues that the legislative history of OPA supports its understanding of the Trustees' access to the Fund. Memorandum for the Commander, National Pollution Funds Center, from Chief, General Law Division, U.S. Coast Guard at 4 (Oct. 27, 1992); *see also* CG Op. at 4. The pertinent legislative history, however, fails to provide persuasive support for DOT's position. The limited evidence of congressional intent that is available suggests that Congress intended to permit Trustees to obtain compensation directly from the Fund for natural resource damages under section 1013 of the Act. Moreover, given the great significance of a conclusion that Trustees may not obtain such compensation, the very paucity of evidence supporting the DOT construction of the statute, standing alone, casts doubt on that construction.

Because the provision excluding the payment of claims pursuant to section 1012(a)(4) from the annual appropriations requirement was first introduced as part of the Conference substitute version of the bill, our review of the legislative history must focus on the Conference Report and subsequent debate.[13] In describing section 1012(a)(4), the OPA Conference Report stated that "amounts are available under category (4), without further appropriation, *to pay uncompensated claims in accordance with section 1013.*" H.R. Conf. Rep. No. 101–653, at 114 (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 792 ("Conference Report") (emphasis added). In differentiating the uses of the Fund authorized under subsections (a)(1) through (3) of section 1012, which were made subject to appropriations, the Conference Report stressed that "[t]hese amounts may be obligated by the Federal official or officials designated under the regulations authorized in subsection (c), *and are not necessarily subject to the claims procedures in section 1013.*" *Id.* at 113, *reprinted in* 1990 U.S.C.C.A.N. at 792. (emphasis added). Thus, the Conferees recognized the distinguishing characteristic warranting payment of claims under section 1012(a)(4) without a requirement for further appropriation — i.e., such payments were predicated on prior compliance with the section 1013 claims procedure.

The Conference Report also contained a separate explanation of the section 1013 claims procedure and how it was adopted by the Conference. *Id.* at 117, *reprinted in* 1990 U.S.C.C.A.N. at 795. The explanation states, "[i]f full compensation is not available to settle a claim presented in accordance with this section, a claim for uncompensated removal costs and damages may be presented to the Fund." *Id.* This explanation contains no suggestion that a claim for damages presented

---

[13] It should also be noted, however, that the legislative history preceding the Conference Report is consistent with the view that Congress intended that Trustees should be able to receive compensation from the Fund pursuant to the section 1013 claims process *See, e g,* S Rep No 101–94, at 10 (1989), *reprinted m* 1990 U S C.C A N 722, 731 ("the Fund is to assure *prompt access* to sufficient sums to pay all removal costs and *restoration of natural resource damages*") (emphasis added); H.R. Rep. No 101–242, pt 2, at 35 (explaining that "all claimants, whether governmental or individual," would be able to submit their claims to the Fund following exhaustion of the settlement provisions and "recover in full for a broad list of clearly spelled out damages")

to the Fund by Trustees would be treated any differently than one presented by any other claimant. Given the fact that Trustees are the *only* claimants able to assert natural resource damages claims under section 1013, and given that prompt compensation for natural resource damages was a paramount concern of the legislation, it would be surprising for the Conferees to use such unqualified language if they intended to bar Trustees from obtaining compensation from the Fund on their claims unless an annual appropriation was enacted.

Additionally, the floor debates on the Conference Report reflect the fundamental objective that the Fund "should be available for prompt, adequate compensation to oilspill victims without having to endure endless and costly litigation." [14] 136 Cong. Rec. 22,289 (1990) (remarks of Rep. Stangeland). Similarly, in urging adoption of the Conference Report on the House floor, the House sponsor of the bill, Representative Jones, explained as follows:

> Finally, we make it easier for victims of oilspills to recover for economic damages, *natural resource damages*, subsistence loss, and others. They can seek reimbursement from the spiller or *directly from the $1 billion Federal trust fund.*

136 Cong. Rec. at 22,285 (emphasis added) (remarks of Rep. Jones). Likewise, in further House debate on the Conference Report, Representative Fields observed:

> [T]his landmark legislation provides that those injured by an oilspill will be fully and swiftly compensated for their losses — such as property damage, lost income, *damage to natural resources*, and lost business opportunities. Once this legislation is signed into law, those adversely affected will not have to wait years in order to recover their losses. In fact, if an agreement with a spiller cannot be reached within 90 days, injured parties will be compensated from the $1 billion oil industry-financed fund and the fund will seek reimbursement from the spiller later.

136 Cong. Rec. at 22,291 (emphasis added) (remarks of Rep. Fields). A similar understanding of the Conference Substitute was expressed in debate in the Senate. *See id.* at 21,718 ("we include [a] $1 billion industry-financed cleanup fund, and full compensation for natural resource damage") (remarks of Sen. Kerry); *id.* at

---

[14] Legislative history preceding the Conference Report also stresses this purpose. As stated in the Senate Committee Report on OPA.

> One of the purposes of the Fund is to provide a source of money for *immediate cleanup activities or damage compensation* in the event a spiller does not act promptly. In such a case, the Fund would be used for removal costs and *would be available for prompt damage compensation*

S. Rep. No 101–94, at 5, *reprinted in* 1990 U.S C C.A.N. at 727 (emphasis added) The Senate Report further stated that the Fund's availability for such prompt damage compensation extended to natural resource damages claims. *Id* at 10, *reprinted in* 1990 U.S.C C.A.N. at 731

21,716 (to compensate Federal agencies, States and citizens for damages from oil spills, "the legislation makes available $1 billion — from a fee on the oil industry — to pay for spills where the polluter cannot be found, cannot pay, or where liability limits have been reached") (remarks of Sen. Baucus).

These statements demonstrate that providing compensation for damages to natural resources was a central purpose of OPA and that Congress envisioned that payment of such claims would occur within the comprehensive framework established in the Act. Against this backdrop, it seems unlikely that Congress would have precluded Trustees from pursuing these claims under section 1013 without any reference in the text or legislative history to such an important limitation.

We recognize that portions of OPA's legislative history demonstrate that Congress sought to limit expenditures under OPA by imposing substantial limits on payments from the Fund through the appropriation restrictions of section 6002. *See* CG Op. at 3. For example, during debate on the Jones Amendment to the House bill, which first subjected most payments from the Fund to the appropriations process, Representatives Jones and Panetta both expressed concern regarding the bill's direct spending implications as scored by the Congressional Budget Office. 135 Cong. Rec. 28,258–59 (1989). As Representative Panetta explained, the Jones Amendment was intended to address such concerns:

> The effect of this amendment would be, then, to reduce the direct spending authorized in the bill to $1 million per year, instead of the $114 million in the bill as reported. This is critical, in terms of controlling Federal spending.

*Id.* at 28,259 (remarks of Rep. Panetta). Had such comments reflected congressional understanding of the intended effect of the appropriations restrictions ultimately enacted under section 6002, they would arguably provide some support for DOT's contentions that permitting Trustee claims to be paid from the Fund without further appropriation conflicts with fiscal restraint objectives underlying the measure.

The remarks of Representatives Jones and Panetta, however, were made before the Conference Committee modified the Jones Amendment to provide explicitly that the payment of claims from the Fund pursuant to section 1012(a)(4) of the Act would not require a further appropriation. Rather, the remarks in question were aimed at a fundamentally different provision and could not reflect congressional understanding or intent with respect to the substantially different (and less restrictive) appropriations provisions ultimately enacted in section 6002.

## 4.

Finally, it has been argued that congressional inaction with respect to a subsequently proposed amendment intended to overturn the Comptroller General's

interpretation of OPA's Fund access provisions should be regarded as a form of legislative ratification of that interpretation. We do not find this line of reasoning persuasive here for a number of reasons.

This argument invokes the Supreme Court's approach in cases such as *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), where the Court explained:

> Although we are chary of attributing significance to Congress' failure to act, a refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it.

*Id.* at 137; *Bob Jones University v. United States*, 461 U.S. 574, 599–600 (1983) (although "[n]onaction by Congress is not often a useful guide," inaction following prolonged and extensive congressional consideration of legislative proposals to overturn an administrative interpretation may produce "unusually strong" evidence of legislative acquiescence).

The cases ascribing significance to legislative inaction are generally premised upon informed congressional acquiescence in a longstanding interpretation by the executive branch agency charged with administering the statute in question. In *Bob Jones University*, for example, the Court invoked the principle only after stressing that "for a dozen years Congress has been made aware — acutely aware — of the IRS rulings of 1970 and 1971." 461 U.S. at 599. Here, the ruling in which Congress allegedly acquiesced was considered only by a committee of Congress in early 1996, only a few months after it had been issued in October, 1995, by the Comptroller General. Thus, the circumstances posed here simply do not fit the pattern of the leading cases finding persuasive evidence of acquiescence by inaction.[15]

Moreover, congressional attention to the proposal that would have effectively nullified the Comptroller General's ruling was not only very brief in duration but limited in nature. The amendment in question, originally proposed as section 204 of S. 1730 during the 104th Congress, would have added section 1012(a)(2) to the existing Fund payment provisions exempted from section 6002's subsequent

---

[15] The limited congressional attention to the Comptroller General opinion at issue here presents the same considerations addressed by the court in *Lanehart v Horner*, 818 F 2d 1574 (Fed. Cir 1987), where the court rejected a similar legislative ratification argument concerning an administrative interpretation of federal firefighters' overtime pay under the Fair Labor Standards Act As the court stated:

> We find this argument singularly unpersuasive in the context of this case. In the cited cases, the issue involved "considerable public controversy," or Congress had a "prolonged and acute awareness" of the importance of the issue. *Bob Jones*, 461 U.S. at 601, 103 S. Ct at 2033. The overtime pay of firefighters did not rise to these levels in Congress.

*Id.* at 1579 (citation omitted)

appropriations requirement. It would thus have removed the crucial premise to the Comptroller General's decision and would have eliminated any doubt that Trustees could recover natural resource damages from the Fund without further appropriation. However, that amendment was modified by the Senate Committee on Environment and Public Works, which approved and reported S. 1730 with an amendment to section 6002 that did not include the appropriations exemption for section 1012(a)(2) and thus did not nullify the Comptroller General's opinion. *See* S. Rep. No. 104–292, at 31–32 (1996). In any event, however, S. 1730 was never taken up by the full Senate or the House. Consequently, congressional consideration of the proposal to override the Comptroller General's interpretation was apparently limited to action on a single amendment by a single committee of the Senate.[16]

In *Bob Jones University*, the Court departed from the general rule [17] that congressional inaction "is not often a useful guide" only after stressing that "few issues have been the subject of more vigorous and widespread debate and discussion in and out of Congress" than the educational segregation issue implicated by the IRS ruling under consideration there. 461 U.S. at 599. In light of the lengthy and widespread congressional exposure to legislation concerning that ruling, the Court observed:

> It is hardly conceivable that Congress — and in this setting, any Member of Congress — was not abundantly aware of what was going on. In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bill proposed on this subject provides added support for concluding that Congress acquiesced in the IRS rulings in 1970 and 1971.

*Id.* at 600–01.

Here, the record does not demonstrate anything like the prolonged, acute, and widespread congressional consideration of the Comptroller General's 1995 opinion that provides the necessary justification for ascribing significance to congressional action under the holding of *Bob Jones University. See also Missouri v. Andrews*, 787 F.2d 270, 287 (8th Cir. 1986) (rejecting argument that failure to amend statute ratified agency's interpretation of statute where the "record fails to show the degree of congressional approval necessary to override the intent of the . . . Congress"), *aff'd sub nom. ETSI Pipeline Project v. Missouri*, 484 U.S. 495 (1988). Moreover, the interpretation at issue here was not longstanding and, indeed, was never incorporated in the governing agency regulations. Finally, the interpretation

---

[16] The 104th Congress did enact some unrelated amendments to OPA as part of the Coast Guard Authorization Act of 1996, Pub L No 104–324, 110 Stat 3901, but the amendment originally intended to overturn the Comptroller General's ruling on Trustee access to the Fund was not included in that legislation *See* S. Rep. No. 104–160 (1995), *reprinted in* 1996 U S C C A N. 4239

[17] *See Brecht v Abrahamson*, 507 U S 619, 632 (1993)

is at odds with the language of the statute and is not supported by the legislative history. Under such circumstances, the fact that Congress did not enact legislation overturning the Comptroller General's interpretation does not provide persuasive evidence of congressional ratification.

Considering the legislative record as a whole, therefore, we are unable to conclude that Congress's response to proposed amendments to section 6002 of OPA offered in the 104th Congress provides significant legislative evidence supporting the Comptroller General's opinion concerning Trustee access to the Fund.

## Conclusion

In light of all the foregoing considerations, we conclude that section 1012(a)(4) of OPA authorizes payments from the Fund to natural resource trustees on claims for uncompensated natural resource damages pursued in accordance with section 1013. Under section 6002(b) of OPA, such payments may be made from the Fund without the need for further enactment of appropriations.

RANDOLPH D. MOSS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*